**Joe Mario TREVINO, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69337.**

Court of Criminal Appeals of Texas,
En Banc.

June 12, 1991.

Rehearing Denied Sept. 18, 1991.

Art Brender, Terry M. Casey and Frank P. Colosi (Court-appointed on appeal), Fort Worth, and Charles Van Cleve (Court-appointed on appeal), Arlington, for appellant.

Tim Curry, Dist. Atty., and C. Chris Marshall, Mary Thornton Taylor and Rufus Adcock, Asst. Dist. Attys., Fort Worth,

Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

On January 17, 1983, the body of eighty-year-old Blanche Miller was found inside her ransacked home. The victim had been strangled and raped. Numerous items were stolen during the offense including a television, a stereo, a radio and the victim's car. Appellant was convicted of this capital offense and his punishment was assessed at death. This is an appeal from that conviction.

In his first point of error, appellant contends the trial judge reversibly erred during the punishment phase of trial when he refused to allow the introduction of an exhibit purporting to be a psychological assessment of appellant. The Harris County Department of Education at the request of the Harris County Probation Office had conducted a psychological assessment of appellant when he was twelve years old. Appellant's exhibit contained the written findings concerning the psychological assessment. This exhibit was accompanied by a certificate made out by the records custodian of the Texas Youth Council. Said certification averred:

"[T]he records attached hereto consists of true and correct copies of records made by an employee under the direction of a duly qualified officer for the Texas Youth Commission as a consequence of the detention of Joe Mario Trevino, Jr. (Date of Birth: July 25th, 1962).

"Further, the records hereto attached are records of the Texas Youth Commission which were created in the regular course of business, and it was the regular course of business at the Texas Youth Commission for an employee or representative with personal knowledge of the act, event or condition recorded to make the memorandum or record or to transmit information thereof to be included in such memorandum or record; and the memorandum or record was made at or near the time of the act, event or condition recorded or reasonably soon thereafter. The records attached hereto are exact duplicates of the original, and it is a rule of the Texas Youth Commission to not permit the originals to leave my custody."

The State at trial objected to the introduction of the exhibit alleging the certification to be improper. Specifically, the State alleged that the certificate was improper because it stated that the report was compiled by an employee of the Texas Youth Commission, while the exhibit, on its face, was shown to have been prepared by an employee of the Harris County Department of Education. The trial judge sustained the State's objection and denied the admission of the exhibit.

On appeal, appellant contends that although the person making the psychological assessment was not an employee of the Texas Youth Council the record was clearly identified as being an official record of the Texas Youth Council and one of which the Council was charged with obtaining and using. Appellant points out that at the time he was under the jurisdiction of the Texas Youth Council Article 5143d, Section 25, Texas Revised Civil Statutes, empowered the council to "make use of law enforcement detentions, supervisory, medical, educational, correctional, segregative and other facilities, institutions and agencies within the State." Furthermore, appellant argues that under Article 5143d, Section 16, V.A.C.S., the Council was charged with keeping written records "of all examinations and of the conclusions based thereon, and of all orders concerning the disposition or treatment of every delinquent child subject to its control." Appellant argues that the exhibit was an official record of the Texas Youth Council which used many agencies, including the probation departments of the juvenile courts who referred delinquent children to it, as its agents for the preparation and collection of relevant sociological and psychological information on the delinquent children entrusted to it.

The State argues that the exhibit is not admissible under either Article 3731a,

V.A.C.S., which provides for admission of domestic records or Article 3737e, V.A.C.S., the Business Records Act (repealed effective September 1, 1986, Texas Rules of Criminal Evidence)[1] and we agree. Clearly the proper predicate was not laid for admission of the exhibit under either Article 3731a or Article 3737e. That is, although the certificate alleged that the document was prepared by an employee of the Texas Youth Council, this was not the case. Both Article 3731a and 3737e require that an employee of the business or of the State generate the record sought to be admitted into evidence. See *Dingler v. State*, 768 S.W.2d 305, 306 (Tex.Cr.App.1989); *Estes v. State*, 162 Tex.Crim. 122, 283 S.W.2d 52, 54 (Tex.Cr.App.1955). See also *Reed v. State*, 811 S.W.2d 582 (Tex.Cr.App.1990).

Furthermore, after examining the exhibit we are persuaded that it does not have "the indicia of reliability" sufficient to insure the integrity of the fact finding process commensurate with the rights of confrontation and cross-examination. The exhibit shows that the author of the report relied on information gleaned from other sources including the Harris County Child Welfare Unit, the Child Guidance Center of Lake Jackson, the Houston Independent School District, and the Great Plains Boys Ranch. Thus the report contains double hearsay. Further, there is nothing in the report to show that the sources of information relied upon by the author were accurate. Moreover, there is nothing in the exhibit to show who performed the psychological tests on

appellant and what the qualifications of that person were.

In *Porter v. State*, 578 S.W.2d 742 (Tex. Cr.App.1979), cert. denied, 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982), we considered a similar situation. There, the State attempted to introduce into evidence several documents from Porter's federal parole file. These documents consisted of various letters discussing Porter's drug use and psychological problems, a warrant application which recommended that Porter's parole be revoked due to his drug use and failure to participate in treatment programs, and a report prepared by an employee of a drug addiction treatment facility which described Porter's poor participation in the treatment program and gave him a poor prognosis. These materials were admitted over Porter's objections and their admission was raised as a point of error on appeal. This Court reversed the conviction recognizing that although certain hearsay evidence may come within a recognized exception to the hearsay rules such evidence is not admissible if it does not have the indicia of reliability sufficient to insure the integrity of the fact finding process. Specifically, we held:

"The documents admitted in this case are letters, or copies of letters, which were kept or received in the District Parole Office in San Antonio. These letters contain hearsay upon hearsay, as well as opinions regarding appellant's mental and physical condition and his amenability to rehabilitation. The sources of these opinions are in most cases unnamed, and in no case are the authors or

---

1. Article 3731a, the Domestic Records Act, provides in pertinent part as follows:

"Section 1. Any written instrument, certificate, record, part of record, return, report, or part of report, made by an officer of this State or of any governmental subdivision thereof, or by his deputy, or person or employee under his supervision, in the performance of the functions of his office and employment, shall be, so far as relevant, admitted in the courts of this State as evidence of the matter stated therein, subject to the provisions in Section 3."

Article 3737e the Business Records Act, provides in pertinent part as follows:

"Section 1. A memorandum or record of an act, event or condition shall, insofar as rele-

vant, be competent evidence of the occurrence of the act or event or the existence of the condition if the judge finds that:

(a) It was made in the regular course of business;

(b) It was the regular course of that business for an employee or representative of such business with personal knowledge of such act, event or condition to make such memorandum or record or to transmit information thereof to be included in such memorandum or record;

(c) It was made at or near the time of the act, event or condition or reasonably soon thereafter."

the unnamed sources shown to be competent to make the statements attributed to them. It defies reason to suggest that these letters, merely because they were collected in a file in a government office, have the indicia of reliability sufficient to insure the integrity of the fact finding process commensurate with the constitutional rights of confrontation and cross-examination." *Porter*, 578 S.W.2d at 746.

See also *McCrary v. State*, 604 S.W.2d 113, 115 (Tex.Cr.App.1980). We find that the reasoning in *Porter* may be applied in the instant case.[2] The trial court did not abuse its discretion when it denied the admission of the exhibit into evidence. Accordingly, appellant's point of error is overruled.

■ In his second point of error, appellant asserts that he was deprived of a jury comprising a fair cross-section of the community as guaranteed to him by the Sixth and Fourteenth Amendments in that the State struck all black jurors from the jury panel. This issue has been decided adversely to appellant in *Holland v. Illinois*, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990). In *Holland*, the Court decided that "[a] prohibition upon the exclusion of cognizable groups through peremptory challenges has no conceivable basis in the text of the Sixth Amendment, is without support in our prior decisions, and would un-

dermine rather than further the constitutional guarantee of an impartial jury." 493 U.S. at 478, 110 S.Ct. at 806.[3] See *Seubert v. State*, 787 S.W.2d 68 (Tex.Cr.App.1990). See also *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); and *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879). We overrule appellant's second point of error.

■ In several points of error, appellant contends that the trial court unduly restricted his voir dire examination and thereby deprived him of information needed for the intelligent exercise of his peremptory challenges. A defendant's constitutional right to counsel includes, under Article 1, Section 10, Texas Constitution, the right of his counsel to question the members of the jury panel in order to exercise intelligent peremptory challenges. *Powell v. State*, 631 S.W.2d 169, 170 (Tex.Cr.App.1982); *Mathis v. State*, 576 S.W.2d 835, 836–837 (Tex.Cr.App.1979). Ordinarily, the trial court should give the defendant great latitude in questioning the jury panel during voir dire; however, the trial court has the authority to impose reasonable restrictions upon the exercise of the voir dire examination for various reasons, among them to curb the prolixity of what can

2. The *Porter* Court also questioned whether the documents could be considered "official written instruments" under Article 3731a:

"Clearly, the recordation pursuant to law of official acts, events, or matters relating to the operations of a federal parole office or to particular parolees, about which there can be no reasonable dispute, is done in the performance of the functions of a government officer's official duties. Cf. *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943); *Loper v. Andrews*, 404 S.W.2d 300 (Tex.1966). But the fact that a district parole office makes a practice of maintaining in a file any opinion or conclusion concerning a parolee within the office's charge, regardless of its source, does not necessarily put those statements in the class of records which are kept in the performance of the functions of a government officer's duties. To hold that such informal records are included within Article 3731a, supra, would pervert a rule 'designed to facilitate admission of records which experience has shown to be quite trustworthy.'" *Porter*,

578 S.W.2d at 747 citing *Palmer v. Hoffman*, 318 U.S. 109, 113, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

The same conclusion is made in McCormick & Ray, *Law of Evidence*, Section 1272 (3rd Ed. 1980).

3. Appellant writes that at the time of the preparation of his brief the same issue was pending before the United States Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This is incorrect. In *Batson*, although the petitioner attempted to premise his claim on "the fair cross-section of the community" requirement found in the Sixth Amendment, the Supreme Court based its opinion on the Equal Protection Clause of the Fourteenth Amendment and expressed no view on the merits of any of the petitioner's Sixth Amendment arguments. *Batson*, 476 U.S. at 124, n. 4, 106 S.Ct. at 1716, n. 4. Appellant before this Court does not rely upon the Equal Protection Clause and, as stated above, the Supreme Court has decided the Sixth Amendment issue adversely to him.

become the lengthiest part of a criminal proceeding. *Bodde v. State*, 568 S.W.2d 344, 350 (Tex.Cr.App.1978), cert. denied 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979).[4] As this Court stated in *Smith v. State*, 513 S.W.2d 823 (Tex.Cr.App.1974):

"While appellant certainly has the right to examine the jurors to the end of forming his own conclusions, there is also no doubt that reasonable controls may be exercised by the trial court for various reasons. Voir dire examination can become the lengthiest part of the proceedings.... To curb some prolixity, it is recognized that courts need have a discretionary area within which the examination might be reasonably limited." 513 S.W.2d at 827.

As such, we will reverse a trial court's restriction of voir dire if upon review it is determined that the trial court abused its discretion. *Id.*

■ In a single point of error, appellant complains that the trial court abused its discretion in limiting the voir dire of prospective jurors Devenport, Berlin and Barbee. Appellant attempted to inquire if the prospective jurors would consider the youthfulness of the offender in mitigation of punishment. At no time did appellant explain to these veniremen that the law requires a juror must be able to consider the age of the offender in the assessment of punishment. The appellant either asked open ended questions ("would you consider evidence of the youthful age of any criminal defendant") or questions wherein he attempted to bind the prospective jurors as to whether they would mitigate punishment due to the age of the offender ("In dealing with the death penalty ..., could you consider as mitigation or in lessening the punishment the youthful age of a person convicted of capital murder"). Appellant was entitled to inform the jurors that the law requires that they consider the age of the defendant in the assessment of punishment and if they could do so. This was not done. Our reading of the record indicates that in all three complained of in-

stances the defense asked questions in hopes of binding the particular juror to a particular course of action without explaining to them what was required under the law. The trial court did not abuse its discretion in refusing to allow the questioning. Appellant's sixth point of error is overruled.

■ In his seventh point of error, appellant complains that his voir dire examination of prospective juror Emma Graves was impermissibly limited and his ability to exercise intelligently his peremptory strikes was denied when the trial court refused to allow him to ask, "[T]hough, you are going to be asked to judge the facts of the case and can you do that objectively without letting the emotion that might be involved interfere with your duty as a juror to return a true verdict?" The State objected to this question as, "Counsel trying to pin this prospective juror down as to her mental processes in arriving at a verdict." The trial court sustained the objection and told appellant's counsel to rephrase the question. Thereupon appellant's counsel asked:

"Q. Mrs. Graves, sometimes as a juror, jurors are forced to—in arriving at a verdict, they are forced to take a very unpopular stand with regard to the outcome of a case, and would the fact that if the evidence that was presented in this case, if the evidence failed to meet the burden of proof beyond a reasonable doubt—the definition or whatever that definition of reasonable doubt you may have, if the State didn't meet it's (sic) burden of proof, could you as a juror—even though it may be an unpopular decision with the State *and the members of the family*, could you do that based upon the evidence presented to you in the case? [Emphasis added.]

"A. I would do my best to give an unreasonable doubt—I mean, no unreasonable doubt but impartial—weight all of the evidence before.

"Q. And that would be true even though the result—

4. In the instant case, jury selection began on May 15, 1984, and did not end until June 19, 1984. The transcription of the voir dire examination fills more than 3500 pages of the record.

"A. Either way.

"Q. —might be unpopular to the State?

"A. Yes, sir." (emphasis added)

Graves' responses reflect that appellant received an answer to the question he insists the trial court should have allowed and the record clearly shows that she would render a verdict solely on the evidence and without any regard to the sympathies of the victim's family or anyone else. We cannot say that the trial court abused its discretion in forcing appellant to inform the prospective juror that the law requires that she base her verdict upon the evidence and that she is not to be swayed by public opinion, and to thereafter inquire if she could follow that law. This point of error is without merit and is overruled.

■ In his ninth point of error, appellant argues that the trial court abused its discretion by refusing to permit the following question:

"Q. Now, setting aside for a moment what the prosecutor has told you about the death penalty, and what the law is regarding the death penalty, if you could change the law to include more instances where the death penalty should be invoked, would you do that?"

The trial court sustained the State's objection to this question commenting, "I don't think the prospective juror has the ability to change the law and that was the effect of your question." Appellant maintains that this ruling prevented him from fully exploring the views and feelings of the prospective juror and also prevented the defense from establishing that the prospective juror was irrevocably opposed to a life sentence in a capital murder case. Appellant also asserts that the court's ruling prevented him from obtaining sufficient information with which to exercise intelligently his peremptory challenges. We disagree.

When counsel asked the prospective juror the open-ended question of how she would change the death penalty law, he was embarking on a global fishing expedition; his question is overly broad and impermissible. See *Smith v. State*, 703 S.W.2d 641, 645 (Tex.Cr.App.1985); *McManus v. State*, 591 S.W.2d 505, 520 (Tex. Cr.App.1980). The trial court did not abuse its discretion in refusing to allow such questioning. This point of error is overruled.

■ In his tenth point of error, appellant argues that the trial court abused its discretion in limiting the voir dire of prospective jurors James Hearne and Rubin Massey. Defense counsel attempted to question them about their views on whether an indictment was any indication of guilt. Appellant maintains that as a result of such restriction he could not intelligently exercise his peremptory challenges. The following occurred during defense counsel's voir dire of prospective juror Hearne:

"Q. Now, I will ask you if you believe or think or that since a person has been indicted, brought into court, that he might be a little bit guilty?

"MR. ADCOCK [State's Attorney]:
Your Honor, at this time we are going to object to that question, and simply asks (sic) counsel to state the law correctly to the prospective juror; that the Court will instruct him that as a matter of law that the indictment is no evidence of guilt whatsoever and whether or not he could follow that law.

"THE COURT:
The Court will instruct the juror that at the appropriate time, the Court will give you a charge which will contain the statement given earlier to the total panel; that the indictment itself is no evidence of guilt and it should not be considered in any way as evidence of guilt.

"MR. MOLINA [Defense Attorney]:
Your Honor, has the prosecutor's objection been sustained?

"THE COURT:
Yes, sir."

Appellant, citing *Mathis v. State*, 576 S.W.2d 835 (Tex.Cr.App.1979), and *Campbell v. State*, 685 S.W.2d 23 (Tex.Cr.App. 1985), argues that when the trial court sustained the State's objection to his ques-

tion it impermissibly restricted his voir dire examination.

In the instant case, we have no absolute limitation of appellant's voir dire as that which occurred in *Mathis* and *Campbell.* The State's objection was that appellant's question was not phrased correctly. In sustaining the State's objection, the trial court in no way intimated that appellant could not ask a properly worded question regarding the prospective juror's ability to follow the law. Indeed, the prosecutor's objection informed appellant that the proper question would have been "as a matter of law the indictment is no evidence of guilt whatsoever and whether ... [the prospective juror] could follow that law?" Appellant was not entitled to inquire if the prospective juror felt him to be "a little bit guilty" because of the indictment against him. Unfortunately defense counsel made no attempt to ask a properly phrased question of this venireman. In *Abron v. State,* 523 S.W.2d 405 (Tex.Cr.App.1975), this Court noted that a trial court may disallow questions during voir dire which have been asked in improper form. 523 S.W.2d at 408. We find that this is what occurred in the instant case. The trial court acted properly when it restricted appellant from asking an improperly worded question. *Smith,* 703 S.W.2d at 645; *McCarter v. State,* 478 S.W.2d 524, 527 (Tex.Cr.App. 1972).

As to prospective juror Massey, we find that appellant waived error, if any. During voir dire, appellant also asked Massey if he felt that because appellant had been indicted he "must be a little bit guilty of something." Again the prosecution objected to the use of the words "little bit guilty" and requested the court to instruct Massey that an indictment was no evidence of guilt. The court admonished defense counsel to include in his questions "a sufficient definition of the law so that the witness can correctly respond to the question." The court then instructed Massey that an indictment was no evidence of guilt. The following then occurred:

"MR. BANKSTON [Co–Defense Attorney]:

Your Honor, in all of the conversations—in order so that I won't again transgress on the Court's ruling, did the Court sustain the objection that the prosecutor made? I don't know how to proceed; whether I should ask the same question again or whether I need to rephrase my question or what—

"MR. ADCOCK:

Your Honor, in light of the court's correct statement of the law, I will withdraw my objection.

\* \* \* \* \* \*

"MR. BANKSTON:

Well, we would—even though the prosecutor is withdrawing it, since the Court has already given instructions to the juror, we would ask the court for a ruling as to the prosecutor's objection?

"THE COURT:

The objection is withdrawn. The Court has stated to the prospective juror the law. If you wish the witness to answer the question, I will direct the witness to answer. If not, we will pass on it.

"MR. BANKSTON:

Note our exception to the Court's refusal to give a ruling to the prosecutor's objection. I will move along.

\* \* \* \* \* \*

Your Honor, in view of the court's ruling in limiting the defendant to questions in this area, in essence denying the defendant effective assistance of counsel and denying the defendant the right to intelligently exercise preemptory (sic) strikes, we will pass this witness. *We have no more questions.*" (Emphasis added)

Thus, the record clearly shows that the trial court in no way restricted appellant's right to voir dire prospective juror Massey. At the conclusion of the exchange regarding the State's objection, the trial court clearly invited defense counsel to ask the question again. Nevertheless, defense counsel decided to forego asking the question which he now maintains he was prohibited from asking. Appellant should not now be heard to complain. Appellant's

tenth point of error is without merit and is overruled.

■ In a multifarious point of error, appellant complains that during the voir dire examination of prospective juror Brian Westbrook the trial court, on several occasions, erroneously sustained the State's objections to appellant's questions. Westbrook testified that he knew several of the police officers who might be witnesses in the case. Thereupon the defense began questioning Westbrook regarding his belief as to the credibility of police officers. Appellant asserts that reversible error was committed when the court sustained the State's objection to the following question:

"You know that we are going to have— in any criminal case you have police officers that are witnesses and, you know, like I said, regular citizens, so there may be a conflict of testimony and that may be in conflict with a police officer's testimony.

So would there be a tendency on your part to believe the police officer's testimony in case there is conflict?"

After this question was asked the State objected and the trial court sustained the objection. Now appellant maintains that he should have been allowed to ask the question. Again, we must disagree with appellant.

A review of the record shows that the trial court was not preventing appellant from exploring this area. Prior to this question appellant had been allowed to explore in depth Westbrook's feelings on this issue:

"Q. I will ask you in this fashion, no matter what the other evidence may show, could you believe that a police officer would take the witness stand and under oath, tell the jury direct lies and misrepresentations?

"A. I believe they could do it, yes. They are people. The ones I know are very much like other people.

\* \* \* \* \* \*

"Q. You know Officers Kennedy and Allsbrooks and Officer Huffman and they are potential witnesses in this case. And as a juror, you would be asked to decide on their testimony and evidence, and because of your relationship as friends or acquaintances, would you tend to believe them just a little bit, no matter how slight, simply because of your prior relationship and you know they are police officers and you know them?

"A. I am not sure that a friendship would sway that, but you know, if a guy's never lied to me, I guess I would tend to believe him more than one that had.

\* \* \* \* \* \*

"Q. Then from your answer, I gather that you are saying these acquaintances, these police officers, in the past had not lied to you, and therefore, you would judge them in that vein?

"A. Well, it's hard to say yes or no to that question, because I don't know what they are going to say in testimony and I don't know whether I will believe them at that time or not. Yes, if they (sic) something believable, I will believe them, probably.

"Q. So I gather from your answer that there might be a problem of believability, as you have stated it; is that correct?

"A. I don't understand what you mean.

"Q. Well, you stated in your answer that you would tend to believe—to believe those police officers; is that correct?

"A. If he told me something that was far out, I wouldn't believe him. If he told me something that sounded to me that could have happened, and, you know, makes it impressive enough, yeah, I could probably believe him."

Appellant then asked the question which is the subject of this point of error. After the court sustained the State's objection, defense counsel began questioning Westbrook about other areas but shortly thereafter defense counsel returned to the subject of police officers' credibility:

"Q. Let me ask you this, Mr. Westbrook. As a juror, naturally you would be a judge of the facts and you

would judge the witnesses that come before you.

Would it cause you some discomfort or any discomfort to vote for the death penalty in a case where you might know some of the police officers that testified for the State?

"A. You are saying would it cause me any discomfort?

"Q. Yes.

"A. No. I'm—I don't think it would cause me any discomfort, no matter what was going on. If I voted for it, that was because I believe that is what it should have been.

\* \* \* \* \* \*

"Q. ... [B]ut what we need to know is that because in a capital murder case you are talking and the State is asking for the death penalty, and I am simply asking you that if you were selected as a juror, even though you might know some of the police officers, that you still believe that regardless of that relationship, that you would be a fair and impartial juror to a person accused of capital murder?

"A. I guess well—it seems that you are getting me—leading me towards saying no for this question—

"Q. No, I—

"A. I know. I know, and I understand. It's just the repetition, I guess.

"Q. Yes.

"A. I guess I would tend to believe someone that I knew probably more than someone I didn't know."

Thereupon appellant challenged Westbrook for cause. After the State had rehabilitated the juror, the court overruled appellant's challenge for cause. Defense counsel again questioned Westbrook along the same line:

"Q. Do you still believe, sir, Mr. Westbrook, that because you know certain people that would be witnesses, that there would be a slight leaning towards them, that you would believe them more as to others because of your prior relationship with them?

"A. No. I have answered that no before, I think.

"Q. Uh-huh. Well, he asked it and I asked it and I had to reask it.

"A. Okay. No, I wouldn't."

Clearly, defense counsel was not prohibited from questioning the prospective juror regarding his friendship with one of the witnesses or that the witness was a police officer and how such would affect how he would judge the witness's credibility. Counsel was allowed extensive voir dire examination in this area and the trial court was acting within its discretion in excluding repetitious questions. *Patterson v. State*, 598 S.W.2d 265, 272 (Tex.Cr.App. 1980); *McManus*, 591 S.W.2d at 520.

■ The next two instances about which appellant complains concern Westbrook's feelings about the death penalty versus a life sentence. Initially Westbrook indicated that he personally favored the death penalty over a life sentence for an individual convicted of capital murder. Appellant challenged the venireman for cause. During the State's attempt to rehabilitate the prospective juror, Westbrook acknowledged that his previous answers had been his personal opinion but he could lay that opinion aside and answer the punishment questions strictly on the evidence presented. The court then overruled appellant's challenge for cause. Defense counsel continued his voir dire examination:

"Q. Mr. Westbrook, you said in response to the prosecutor's questions that you had—that you were biased. I believe that's the word that you used. And that you were leaning for the death penalty going into the trial and that was your opinion; is that right?

"A. Well, when asked if it was an opinion, yes. That is my opinion.

"Q. Okay.

"A. When someone says, you know, you are supposed to listen to evidence and decide from it, I could probably handle that, too.

"Q. Now, when in court here, when you say I probably can, or I may be able to, the lawyers will come right back and say, well, let me ask it in this fashion and see if I can get a more positive answer.

"A. Okay.

"Q. Because of your personal beliefs as to the death penalty and your thoughts, do you think that that would affect the way that you decide on the death penalty or the life sentence?

"MR. WILSON:

Your Honor, here again, he's answering question. He's not saying death penalty or life sentence. He's answering questions, and this question is improperly framed.

"MR. BANKSTON:

Your Honor, was that an objection?

"MR. WILSON:

Yes, we object to it.

"MR. BANKSTON:

What was the objection?

"MR. WILSON:

That it was improperly framed, Your Honor.

\* \* \* \* \* \*

"THE COURT:

I will sustain the objection as it is. You can try to persue (sic) the area of inquiry that you are working on."

Clearly, the court was not prohibiting defense counsel from inquiring as to Westbrook's feelings regarding how the death penalty would affect his deliberations on the punishment issues. The court had allowed both sides much latitude in examining Westbrook in this area. Defense counsel's question was improperly framed and the court was instructing counsel to rephrase his inquiry. Counsel did approached this area again much later in the voir dire examination when he asked the following question:

"Q. Because of your feeling about a life sentence and the parole that is attached to it, as you have expressed it, would that affect you in your thinking and in your decision in deciding be-

tween the death sentence and a life sentence?

"MR. WILSON:

Your Honor, I object to that question unless he limits it to his answer to the special issues or would he let that influence him or would he answer those special issues from the facts.

"THE COURT:

Give me a minute. I am going to sustain the objection."

Appellant asserts that in sustaining the State's objection to this question the trial court improperly restricted his voir dire. This is incorrect. The trial court merely sustained an objection to an improperly phrased question. Thereafter defense counsel was allowed to pose the properly phrased question to Westbrook and was allowed to fully investigate Westbrook's feelings in this area:

"Q. In capital murder cases there—in Texas, of course, the sentencing body is the jury, twelve people. You are given factual questions to answer which ultimately will provide the answer as to whether or not the person gets a death sentence or a life sentence.

Because of your feelings in leaning towards the death penalty, would those leanings affect you in deciding on the death penalty as opposed to a life sentence?

"A. After I have heard the facts, probably not. Okay. I will say instead of probably, just no. The facts would probably speak for themselves."

■ The last two instances about which appellant complains in this point of error concern his inquiry into Westbrook's feelings regarding the minimum punishment of five years for the offense of murder. Defense counsel explained the concept of the lesser included offense of murder to Westbrook. When counsel asked Westbrook if he could envision any murder case in which a five year sentence would be justified, Westbrook replied that he thought five years would be too light of a sentence. The State objected to the line of question-

ing on the grounds that the defense had earlier waived the minimum punishment of five years in this case. The court gave the following instruction:

"THE COURT:

It is the feeling of the Court that either party can challenge on the minimum sentence issue.

My concern is that when these questions are asked, just flat asked, can you consider the five-year sentence without some kind of preamble to it, we don't get a fair opinion from a juror.

Now that's my concern. I want to get a sufficient preamble to your ultimate question so that we can get the actual feeling of a jury, of a prospective juror; okay?

\* \* \* \* \* \*

The Court will permit interrogation on the question of whether or not he can consider the minimum punishment, but I still state that the preamble—however you phrase that question, it ought to include something about under proper circumstances, can you conceive of a set of circumstances, something like that. To just ask a man, can you give five years for murder, doesn't help us much; okay?"

Defense counsel then resumed his questioning of Westbrook:

"Q. A while back you mentioned something about a life sentence and being out on parole, and does that affect what you thought about the life and the parole business? What you said earlier, does that go into your thinking when you say that five years would be a slap on the hand?

"A. Well, the way I understand the parole system, you do half the time that you are in for, or less. That would mean two and a half years and you would be back on the street.

A guy gets busted with a pound of marijuana, he gets twenty years and spends ten. Murder gets five, that doesn't make sense. I mean, to me that was bigger crime than the guy carrying marihuana down the street

and got caught with it, okay? That's . . .

"Q. So what you are feeling is that because of the—the way you are thinking and your opinion is that in any given murder case, that you could not consider five years as the sentence.

"MR. GORDON:

I will object unless he preambles it, if the facts to justified (sic) it, can you fairly consider it.

"THE COURT:

It will be sustained."

Once again the sustaining of the State's objection was clearly not a restriction of appellant's voir dire examination. The court had earlier spelled out the proper question. Counsel's question was clearly deficient and the objection was properly sustained.

■■■ Following this last interchange appellant challenged Westbrook for cause for several reasons, including that he could never give the minimum punishment for the lesser included offense of murder. Appellant's challenge was overruled after the State rehabilitated the juror; however, defense counsel immediately returned to this area of questioning:

"Q. . . . You have pretty strong feelings against the five-year minimum sentence for murder, don't you?

"A. Yes.

\* \* \* \* \* \*

"Q. And I suppose from your answer that those strong feelings that you have against that five-year minimum would affect the way you would decide on punishment on this case?

"A. No.

"Q. It wouldn't at all?

"A. I haven't heard any testimony, therefore, I couldn't even tell you; but if the testimony said that he didn't do it to me, I would definitely say he didn't do it. Okay.

"Q. I am not talking about guilt or innocence.

"A. Okay. After we have established guilt, okay. All right.

"Q. He's guilty of murder and now you have it.

"A. If guilt is established—"

The State objected to this question: "[I]n this case he's charged with capital murder, and unless he says that he has been found not guilty of capital murder and that only murder is involved, I am going to object to that question. It's misleading." The trial court then instructed: "Counsel, if you will, restrict your questions and phrase them so as to get a specific answer, rather than some general question so that from the answer we get we cannot draw some flat conclusions as to what the feelings of this gentleman are." Appellant's counsel continued:

"Q. Well, let me ask you it (sic) that fashion. If you have found someone not guilty of capital murder and you found him guilty of murder, would those strong feelings that you have against the five-year sentence affect—

"A. I would have to say yes.

"Q. You know, those strong feelings equal that you don't favor a five-year minimum sentence on the murder case; is that about the bottom line?

"A. That's about it.

"Q. And that's how you feel and it would affect you in any murder case regardless of the facts; is that correct?

"MR. ADCOCK:
Your Honor, we are going to object. That was not his answer. He turns and changes it to say, any murder case.
The answer he gave is that he did not favor it. He says, that is correct. And then he turns right around and says, then in any murder case, and that is improper. This gentleman has gone over this—

"THE COURT:
Sustained.

"MR. ADCOCK:
—has gone over this with us many times and I object. It's repetitious.

"THE COURT:
We will sustain."

This latter questioning was clearly repetitious. The trial court properly sustained the State's objection and we find no abuse of discretion in the trial court's actions.

Because appellant's voir dire was not improperly restricted, his thirteenth point of error is overruled.

In his twelfth point of error, appellant argues that his voir dire examination of prospective juror Rubin Massey was impermissibly restricted when the trial court prohibited him from asking if he would apply the philosophy of "an eye for an eye" in arriving at what he considered a fair punishment. The State argues that the question was repetitious. We agree with the State.

During his voir dire examination of Massey, defense counsel asked if he could consider a punishment for five years if an accused was found not guilty of capital murder but was found guilty of murder. Thereafter the following occurred:

"Q. But my question is whether or not you would consider that minimum, that five-year sentence, in a murder case where someone has intentionally and knowingly taken the life of a human being without legal justification whatsoever in a case?

"A. If he knowingly took or they knowingly took the life of somebody else without legal justification—

"Q. Intentionally or knowingly, without legal justification, took the life of another human being.

"A. Could I give them five years; no.

"Q. And you couldn't because—and I guess this would in part be because of your religious beliefs that you told me a moment ago. You all have discussed this very situation, crime and punishment, in your Sunday school class. You have discussed that and your beliefs as to that question are based upon your Sunday school discussions; is that correct?

"A. No, sir. It's based upon my reading of the Bible.

"Q. All right. And what would that be; what part of the Bible do you believe that this philosophy is based on?

"A. The Bible tells you 'eye for eye' and 'tooth for tooth.'

"Q. All right. And that is kind of your philosophy; is that correct?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Now in the event in this particular case, Mr. Massey, that, as a juror—then I take it from what you've told me, that if you were selected as a juror and the jury found that a defendant was not guilty of capital murder, but guilty of murder, then because of these feelings, your religious philosophy, the fact that you believe in this philosophy of an 'eye for an eye' and a 'tooth for a tooth,' that it would be difficult, if not impossible, for you to consider imposing the minimum five-year sentence to a murder case where somebody's life had been intentionally or knowingly taken without legal justification?

"A. Under the circumstances, knowing they took the life deliberately, it would be hard for me to let a man off on five years; yes, sir.

"Q. And that's just not enough in your views?

"A. That's not enough; yes, sir.

"Q. And you wouldn't consider it, then, I take it?

"A. No, sir."

Thereupon the defense challenged Massey for cause. The State rehabilitated the juror and defense counsel resumed his questioning:

"Q. Mr. Massey, I want to make sure you understand what the prosecutor is telling you over here.

Again, it's difficult for you know as we sit here right now what you will do in any particular case without knowing something about that case; but based upon what you indicated to me a moment ago, your philosophy—and this is what I am having to go by, by what you told me—is that some weeks ago you and your Sunday school class sat down and discussed basically this very issue; is that correct?

"A. Yes.

"Q. And it was resolved at that meeting in your church that we were too lenient, as a society, we were too lenient

with the people charged with crimes or convicted of crimes?

"A. Yes, sir.

"Q. Is that right?

"A. (sic) You also indicated to me that you are a person who reads the Bible?

"A. Yes, sir.

"Q. And believes in the Bible; is that right?

"A. (nods head affirmatively)

"Q. And one of the philosophies that you have adopted in your religious training is that philosophy that is stated in the Bible that says an 'eye for an eye,' and 'a tooth for a tooth.' And do you firmly believe in that principle of the Bible?

"A. Well, if you got the evidence—you know, you got to weigh the evidence. If somebody kills somebody just to be killing them; yes, I believe they ought to pay.

\* \* \* \* \* \*

"Q. Mr. Massey, again I think when we left off here you indicated that this 'eye for an eye' philosophy was part of your religious beliefs; was that right?

"A. Yes, sir.

"Q. Now again, there is no right or wrong answer, but my question to you, sir, is that if the evidence presented to you and the facts that indicated that there was an intentional and knowing murder without legal justification for that murder—in other words, there was no self-defense, there was no insanity, there was no legal justification for that murder at all, it was an intentional and knowing killing, taking of another human life; could you, sir, if you were selected as a juror in that particular situation, could you consider the very minimum punishment of five years?

"MR. WILSON:
Object to that question, Your Honor. It does not include in it if he felt the facts justified it.

"THE COURT:
Sustained.

"Q. In a case, Mr. Massey, again basing the same—in a particular case, can you—could you if selected as a juror consider five years in a murder case where there had been an intentional and knowing killing without legal justification?

"A. Well, if we have to have it, I would have to weigh the evidence on it.

"Q. If you weighed the evidence, could you consider it after you have weighed the evidence?

"A. Yes, I could consider after weighing the evidence."

At this point the trial court overruled appellant's challenge for cause and defense counsel resumed his questioning:

"Q. And, of course, Mr. Massey, if selected as a juror, the Court is going to tell you—and I think all of the lawyers will agree with this one principle—and that is you are not required to completely ignore your common sense.

You can take your common sense back there and you can apply whatever common sense you have accumulated through your years of experience. And you may—in conjunction therewith, you may apply whatever personal feelings you may have, whether they be religious, philosophical, or whatever. And that would include your previously stated position concerning an 'eye for an eye' and a 'tooth for a tooth.'

Would you, sir, if you were selected as a juror, would you tend to apply that philosophy that you have so earnestly and candidly told the Court, would you apply that philosophy as a juror back there in arriving at what you may consider to be fair punishment? In other words, would you apply the philosophy of an 'eye for an eye' and a 'tooth for a tooth?'

"MR. WILSON:

Object to that as being repetitious, Your Honor.

"THE COURT:

Sustained."

Appellant asserts that this question was not repetitious because he had not previously inquired whether Massey would apply his biblical philosophy in assessing punishment. The record refutes appellant's contention. Clearly appellant had made such inquiries in regard to the assessment of the minimum punishment of five years for the lesser included offense of murder. Clearly the juror had responded that he would base his decision on the evidence and not on his personal philosophy of an "eye for an eye and a tooth for a tooth." In addition, the record shows that appellant, although not using the language of Massey's personal philosophy, received an answer to the inquiry when he posed the following question immediately after the court sustained the objection to the question in issue:

"Q. Hopefully one final question, Mr. Massey. If you found a person guilty of capital murder, would you automatically vote for the death penalty?

"A. No, sir."

We find that the record shows that appellant was allowed to fully explore this area. The court was correct in cutting off repetitive questioning. Appellant's twelfth point of error is overruled.

▮ In another multifarious point of error, appellant alleges that his voir dire was improperly restricted in that his attempts to discuss the meaning of "deliberate" were cut off by the trial court. Appellant points out four such instances:

*Prospective Juror McElyea*

"Q. ... And I would like to direct your attention, if I may to the first question and that question deals with the deliberateness, the deliberateness or the conduct of the person accused. What does the word 'deliberate' mean to you, ma'am?

"MR. WILSON:

I object to that Your Honor, going into the meaning of terms that are not going to be defined by the Court.

"THE COURT:

Sustained.

"Q. What is your concept of the word 'deliberate'? that's all I am asking. I

am not asking what definition you would apply, but as you sit here as a juror right now, what is your concept of the word 'deliberate'?

"A. Intentional."

*Prospective Juror Sutton*

"Q. My question to you is the word deliberate will not be defined for you. It's whatever definition you happen to use in answering that question. Do you follow me there?

"A. Uh-huh.

"Q. If your definition included—for the word deliberate included premeditation—in other words, it was thought out, planned out; that sort of thing, would you make the State of Texas prove to you beyond a reasonable doubt that in fact it was premeditated before you answered special issue number one yes?

"MR. ADCOCK:
Same objection, Your Honor. He's trying to bind her. We object.

"MR. BANKSTON:
Bind?

"MR. ADCOCK:
Deliberately is a word of common usage. There's no requirement of premeditation. He's trying to define deliberately to have premeditation in it.

"THE COURT:
We sustain the objection, Counsel."

*Prospective Juror Massey*

"Q. One more question, Mr. Massey. This is the last question. What is your definition of deliberate?

"MR. WILSON:
I am going to object to that, Your Honor; going into definitions and deliberately will not be defined by the Court.

"THE COURT:
Sustained, Counsel."

*Prospective Juror Bagnall*

"Q. As I indicated to you a moment ago, just as the Court will not define for you what the term reasonable

doubt means, the Court will not define for you what the term deliberate means.

I can tell you this. The courts of the State of Texas have said that the word intentional and the word deliberate is not linguistically equivalent. In other words, they, don't mean the same thing. And I think that makes sense in light of what you are asked to do in determining whether or not somebody is guilty of capital murder.

One of the questions you will be asked to decide is whether or not the murder or the death was intentionally caused. And in the event that you resolve that issue against the accused in favor of the State, in other words, you find the accused guilty, then you go on into the punishment phase; and the next question you are asked to resolve is whether or not the conduct was deliberate. Can you in your own mind see a distinction between those two burdens of proof?

"A. I think I can, yes.

"Q. I think it makes sense to assume that in both instances we are talking about a state of mind of the person who committed the act.

"A. Yes.

"Q. If we were talking about a state of mind that was less than intentional, you would have already determined that question when you said he intentionally did it. So I submit to you that the word deliberate means even more than the word intentionally. Do you agree?

"MR. WILSON:
I would object, Your Honor, to that as to giving a definition of deliberate. It's common ordinary usage. I object to him suggesting what a definition is.

"THE COURT:
Sustained.

"By Mr. Bankston:

"Q. Mr. Bagnall, if you were selected as a juror, I will simply tell you—and I don't believe anybody will argue with this—that as a juror you can use any

definition of deliberate; whatever it means to you. Okay?

"A. Okay."

This Court has faced similar questions in the past. In *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr.App.1978), cert. denied, 440 U.S. 928, 99 S.Ct. 1264, 59 L.Ed.2d 484 (1979), *overruled for other reasons*, and *Grijalva v. State*, 614 S.W.2d 420 (Tex.Cr.App.1980), defense counsel asked the prospective juror whether she thought deliberate conduct meant carefully considered conduct. When the juror responded affirmatively, the prosecutor objected that defense counsel was attempting to infer that the State was required to prove premeditation. The court sustained the objection and refused to allow the defense to explore the matter further. This Court, noting that voir dire examination would take an unreasonable length of time if attorneys on both sides selected different words throughout the contemplated charge and asked each prospective juror what those words meant, found no abuse of discretion. 568 S.W.2d at 323. Two years later the Court made similar holdings in *Esquivel v. State*, 595 S.W.2d 516, 524–525 (Tex.Cr.App.), cert. denied, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980), and *Milton v. State*, 599 S.W.2d 824, 826 (Tex.Cr.App.1980), cert. denied, 451 U.S. 1031, 101 S.Ct. 3022, 69 L.Ed.2d 400 (1980). Unquestionably, the trial judge has discretion to limit the voir dire examination regarding the definition of the term "deliberately." As such, we find no abuse of discretion in the trial court's limitation of appellant's voir dire examination.

■ Appellant complains that the State was allowed to do what he was not allowed to do; he points to five specific instances in which the State was allowed to explore the definitions of "intentionally" and "deliberately" with the prospective jurors. We set out the pertinent portion of the voir dire examination of prospective Juror Kromer as being representative of the alleged error:

*Prospective Juror Kromer*

"Q. ... And if you and I were out in public and conversing and we used the word 'intentionally' and the word 'deliberately,' will you agree with me that they are almost synonymous?

"MR. BANKSTON:

Your Honor, in answer to that question, I would like to again impose an objection, in that it is an attempt on the part of the State to bind a juror to a meaning of the word 'deliberate' as has been defined and given to the word 'intentional' under the penal code. As the law of the State of Texas has already been outlined to the Court, the courts have said—the Court of Criminal Appeals have said that the two words are not linguistic equivalents. The prosecutor is attempting to circumvent or go around that opinion by implying to the juror, the prospective juror, that those two words are—in fact mean the same thing, and we object to it as being a misstatement of the law and would ask the Court to instruct the juror that the two words don't mean the same thing.

"THE COURT:

The objection is overruled, but we will tell the juror that the word 'deliberately' has—I mean, the word 'deliberately' has not been defined by our statute, but the word 'intentionally' has been defined by our law.

Proceed, Counsel.

\* \* \* \* \* \*

"Q. I take it in every day life those words would almost be synonymous to you?

"MR. BANKSTON:

Again, Your Honor, we object on the same reason previously stated.

"THE COURT:

Overruled. Proceed, Counsel.

"By Mr. Adcock:

"Q. You may answer the question.

"A. Without knowing the legal definition, then I would have to say yes, they are synonymous in my mind at the moment.

"Q. And this is what I am getting down to. However, in this courtroom, and

as you as an officer of the court, when the Judge gives you a charge, he will define to you a definition of the legal word 'intentional' and a person can be held to be intentionally responsible for the commission of a crime if he is simply present and aiding in the commission of a crime.

A good example would be the getaway driver in a robbery case. Even though he didn't go inside a store and point a pistol at anybody or take any money, under our law he could be indicted and found guilty beyond a reasonable doubt that he intentionally robbed someone.

"A. I understand.

 * * * * * *

"Q. Now, if you apply that rationale or that reasoning to a murder situation, I think you can see now why the question is to the jury at the punishment stage, did this particular defendant do it deliberately, you see?

"A. Yes, I see that.

"Q. Okay. If you had two people who were involved in a capital murder, like murder during the commission of a robbery, and one man is up front say at a cash register, and another man is in the back of the restaurant and he kills somebody. See the difference? Both of them can be intentionally guilty of capital murder, but only one of them did it deliberately, you see?

"A. Yes, I understand.

"Q. ... So, there is a difference in their meaning and that's why we have—at the punishment stage, we have this hearing as to determine by the jury, from the facts they have heard in either portion, whether or not the defendant acted deliberately, committed the act deliberately."

The record does not support appellant's allegation. The State never asked any of the prospective jurors to define the term "deliberately." The State's questions merely informed the jurors that the terms "deliberate" and "intentional" did not nec-

essarily have the same meaning. The State's questions seemed to follow a general scheme of explaining to the jurors that the terms were not necessarily synonymous while the defense questions were either open-ended or suggested some definition of the term to the jurors. We find that the trial court did not abuse its discretion. Appellant's eighth point of error is overruled.

■ Finally, in another multifarious point of error and without citation to authority, appellant claims that on numerous occasions the trial court erroneously restricted his voir dire in that, after the State would make a challenge for cause and the prospective juror was passed to the defense for questioning, the trial court limited defense inquiry to the area of the State's challenge for cause. Appellant's brief points out four separate instances where he alleges such restriction occurred. Appellant asserts that this practice denied him effective assistance of counsel in that (1) counsel could not explore other aspects with the prospective juror which might lead him to decline an attempt at rehabilitation and thereby possibly save appellant a peremptory challenge if counsel rehabilitated a juror only to find that he was unacceptable to the defense in other respects, and (2) counsel was unduly restricted in its efforts to rehabilitate jurors because he could not fully explore the complete range of the jurors' thoughts and beliefs.

We have reviewed those four instances and find that in each one defense counsel was in no way restricted from asking the question he desired to ask although the trial court did admonish appellant to stay within the area of the challenge for cause. In each case appellant was allowed to ask the question and he received an answer from the prospective juror. This point of error is without merit. Appellant's fourteenth point of error is overruled.

■ In his next four points of error, appellant argues that the trial court erroneously overruled several challenges for cause he made to prospective jurors.[5] In

---

**5.** In order to present reversible error appellant must show that he was forced to exercise a

points of error three, four and five, appellant complains that his challenges for cause to prospective jurors Berlin, Barbee and Mueller were erroneously overruled when each juror indicated that they would not consider youth as a mitigating factor in determining punishment:

*Prospective Juror Barbee*

"Q. In deciding—Mr. Barbee, in deciding whether to impose the death penalty, would the youthful age of the person accused be of any significance to you in resolving that decision?

"A. The age that the defendant is?

"Q. Yes.

"A. Would his age—

"Q. Yeah, would the age, the youthful age of any person accused, be of any significance to you in resolving the issue as to whether or not the death penalty ought to be imposed?

"A. No. sir."

*Prospective Juror Donald Mueller*

"Q. You know, in dealing with the issues that are going to be raised in punishment, all of the evidence is introduced and you are going to be told to base your decision—your decision on those factual issues based upon the evidence. If there was evidence of youthful age of a defendant convicted of capital murder, would you consider that in setting—in answering those factual issues?

"A. As far as being a youthful age?

"Q. Yes, that the defendant is of a youthful age?

"A. No.

* * * * * *

"Q. And that would not be part of your consideration on the death penalty?

"A. Well, now, are you asking me also that—does that consider the—like the, say, life imprisonment to the death penalty? And you are asking if the younger age would make a difference?

"Q. No, let me clarify that. In the two issues that you would be considering, the factual issues—

"A. Okay.

"Q. —dealing with probability and with deliberateness, and in answering yes or no on those factual issues, and in dealing with the death penalty, would you consider youthful age, if it is offered into evidence?

"A. Well, no, no.

"Q. Okay. And that would not enter into the picture of it?

"A. No, I don't think—in my opinion, I don't think the age would make any difference, if, again, the evidence was there. This again, being whether it was not guilty or guilty in my mind, but no, if I felt one way—you know, if the evidence did not, no, I wouldn't let the age get involved with that.

"Q. Now we are talking about punishment.

"A. Yes, sir.

"Q. Okay. So you would set that aside and wouldn't consider it?

"A. No, because, again, I'm looking in my mind at what you are asking me and yet, I would be looking at the complete case that would be over to get to this point of the trial. And I

peremptory challenge to excuse a prospective juror to whom his challenge for cause should have been sustained. He then must show that he exhausted his peremptory challenges and was later forced to accept a juror whom he found to be objectionable. *Green v. State,* 591 S.W.2d 464, (Tex.Cr.App.1979), cert. denied, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980). The record in the instant case shows that in addition to the fifteen peremptory challenges authorized by Article 35.15(a), V.A.C.C.P., the trial court authorized appellant to exercise two additional peremptories. Appellant exercised his seventeenth peremptory challenge on pro-

spective juror Warner Rankin, Jr. Immediately after the exhaustion of these strikes, appellant requested additional peremptory challenges. The trial court denied this request. Following the voir dire examination of prospective juror Brian Westbrook, appellant requested an additional peremptory challenge since Westbrook was an objectionable juror. The court denied this request. Similar requests were made as to jurors John Fisher, Loyce Bullington and Judy Barnes. These requests were denied by the trial court. We find that appellant has preserved the issues of the trial court's denial of his challenges for cause for review.

wouldn't say that I could let the age, you know, affect my decision as far as guilty or not guilty.

"Q. Okay. I'm talking about the punishment. I may be misunderstanding your answer, but I'm dealing with only the punishment stage. You have already found him guilty.

"A. Okay.

"Q. And now you are considering just the issues deciding whether a person is sentenced to a life sentence or a death sentence.

"A. Uh-huh.

"Q. And I believe your answer is that you would not consider the young age—

"A. Yes, you are right.

"Q. And that would not enter into your deliberations on setting—on answering those issues; is that correct?

"A. Yes, sir."

*Prospective Juror J.R. Berlin*

"Q. In dealing with the death penalty and dealing with the factual issues that you have to answer, could you consider as mitigation or in lessening the punishment the youthful age of a person convicted of capital murder?

"A. The youthful age; no."

Appellant challenged each of the prospective jurors for cause on the grounds that they were biased against the law dealing with age and the consideration of age in assessing punishment in a death penalty case. All three of appellant's challenges for cause were overruled and appellant used a peremptory strike upon each. Appellant argues before this Court that each juror was biased against the law applicable to capital punishment and that the trial court should have sustained his challenges per Article 35.16(c)(2), V.A.C.C.P. He relies on *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), for the proposition that the sentencing authority in capital cases must be permitted to consider any relevant mitigating factor including specifi-

cally the youthful age of the offender. We disagree with appellant.

In *Lockett*, the Supreme Court, examining the Ohio death penalty statute, concluded that the Eighth and Fourteenth Amendments require that the sentencing authority in all but the rarest kind of capital murder case not be statutorily precluded from considering any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant may offer as a mitigating factor as to punishment. Four years later, *Eddings* came before the Supreme Court. Eddings was a sixteen-year-old convicted of first-degree murder of a police officer. Although the Oklahoma death penalty statute provided that in a sentencing proceeding evidence could be produced regarding "any mitigating circumstances" and although Eddings, in mitigation, presented evidence of a turbulent family history and emotional disturbance, the trial judge, in imposing the death sentence refused to consider, as a matter of law, for purposes of mitigation the circumstances of Eddings' upbringing and emotional disturbance. Instead he found the only mitigating circumstance to be Eddings' youth, but he held this to be insufficient to outweigh the aggravating circumstances and thereby assessed the death penalty. The trial judge's assessment of the case was affirmed by the Oklahoma Court of Criminal Appeals. Justice Powell, writing for the majority of the United States Supreme Court, reversed, holding:

"We find that the limitations placed by these courts upon the mitigating evidence they would consider violated the rule in *Lockett*. Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no

weight by excluding such evidence from their consideration." 455 U.S. at 113–114, 102 S.Ct. at 876–877 (footnotes omitted and emphasis in original).

Clearly then, the law provides that youth is a mitigating factor which must be considered. Failure of the trier of fact at least to consider youth in their determination of punishment constitutes error but the law also provides that in certain circumstances the sentencing authority may not find youth to be a significant mitigating factor in the assessment of punishment:

> "Nor do we doubt that the evidence Eddings offered was relevant mitigating evidence. Eddings was a youth of 16 years at the time of the murder. Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation. See *McCautha v. California*, 402 U.S. 183, 187–188, 193, 91 S.Ct. 1454, 1457, 1460, 28 L.Ed.2d 711 (1971). *In some cases, such evidence properly may be given little weight.* But when the defendant was 16 years old at the time of the offense there can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant." *Eddings*, 455 U.S. at 115, 102 S.Ct. at 877 (footnotes omitted and emphasis added).

■ Article 35.16(c)(2), V.A.C.C.P., provides that a vireman may be challenged for cause and excused if he or she indicates a bias for or prejudice against any of the law upon which any party is entitled to rely. Before such excusal is warranted, however, it must be shown that the vireman is biased for or prejudiced against the *law*. Such a showing was not made in the instant case. Although the three individuals stated it was their personal feeling that they would not consider any person's age in answering the special issues, they were never informed that the law required them to make such a consideration of appellant's age—that in certain citations, depending upon the facts of the particular case, they could give youth little mitigating value in the assessment of punishment but they could not refuse to consider it altogether. Thus none of the three addressed the question of whether they were biased against the *law* since the law was never explained to them. A trial court abuses its discretion in overruling a challenge to prospective jurors when it has been established that the juror can not follow the law. But until such a showing is made the trial court will not be found to have so abused its discretion. In the voir dire examination of a prospective juror in *Von Byrd v. State*, 569 S.W.2d 883 (Tex.Cr.App.1978), cert. denied, 441 U.S. 967, 99 S.Ct. 2418, 60 L.Ed.2d 1073 (1979), the defense posed a question on the range of punishment applicable to the lesser included offense of murder and the prospective juror responded that he did not think he could consider probation as a possible punishment. The defense challenged the vireman for cause. The trial judge then questioned the prospective juror who told the judge that he was not opposed to the "probation law" and could consider probation in a proper case. The trial judge then overruled Von Byrd's challenge for cause. This Court in reviewing the case agreed that the vireman was not subject to a challenge for cause. 569 S.W.2d at 891. See also *Goodman v. State*, 701 S.W.2d 850, 859 (Tex.Cr.App.1985) (during the voir dire examination, prospective juror initially expressed a bias but after the law was explained to him he also indicated he would follow the law); *Barefoot v. State*, 596 S.W.2d 875, 881–886 (Tex.Cr.App.1980), cert. denied, 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981) (during the voir dire examination, prospective jurors initially expressed a bias but after the law was explained to them they indicated they could follow the law). In the instant case, the prospective jurors were never given the opportunity to testify as to whether they had a prejudice against the law. Under these circumstances, the trial court did not abuse its discretion in denying appellant's challenge for cause. Appellant's third, fourth and fifth points of error are overruled.

■ In his eleventh point of error, appellant argues that the trial court erred in denying his challenge for cause of prospective juror Leah Sutton after Sutton testi-

fied that she would require the defense to produce evidence of appellant's innocence. During voir dire examination by the defense, Sutton testified that even though the trial court instructed her that the State had the burden of proof she would have to hear evidence presented by the defense before she could render a verdict. Appellant immediately challenged Sutton for cause. During the State's attempt to rehabilitate the juror, the following occurred:

"Q. Now, a while ago Mr. Bankston asked you if you felt that the accused could have been guilty, would you vote—would you have to hear from him before you could vote not guilty. Or did he ask you some question similar to that, or I heard some kind—but you understand the burden of proof is over here with us?

"A. With you.

"Q. Right.

"A. No, sir. I guess I didn't get that part.

"Q. All right. And an accused has the right under the law just to rest right with us and simply argue that we didn't meet our burden of proof. You remember I said we had to shut up or put up—

"A. Okay. You are to prove that he's guilty? They are to prove that he is not guilty, is what it comes to?

"Q. They don't have to prove anything.

"A. They can just shut up is what —

"Q. Right. You remember me saying a while ago, I said we have to shut up or put up?

"A. Uh-huh. Okay.

"Q. So, if the Court instructed you that the burden of proof was over here with the State, there's no burden whatsoever on the accused, could you follow that?

"A. Yeah. I understand it now.

"Q. And then I take it that your answers then to Mr. Bankston's questions is that you could follow the law and you would put no burden on the accused?

"A. Right. And I was saying I had to hear both sides.

"Q. Uh-huh.

"A. I am getting it a little straighter (sic) now.

\* \* \* \* \* \*

"THE COURT:

The Court will charge the jury that the burden of proof is on the State and always remains on the State. It never shifts. Do you understand that?"

The prospective juror indicated that she understood and the trial court asked if she had been confused by the earlier questions. The prospective juror answered "yes." The trial court then asked, "All right. Now, with that understanding, is your answer still the same or would you change your answer in any way?" The venireman stated, "I would have to change it, sir." Thereupon the trial court overruled appellant's challenge for cause. Appellant renewed his challenge for cause after the following colloquy:

"Q. [By Defense Counsel] Well, let's suppose that the defendant—or let's suppose the State of Texas brought you what you felt like was evidence that a person was guilty. Then you would, I take .it, require—you would look to this table over here and you would require this table or the defendant's table to come forward and present to you some evidence to indicate that he was not guilty; is that right or wrong?

"A. That's correct, because this side would have already proved to me that he is guilty.

\* \* \* \* \* \*

"Q. But you would expect and you would require, the, the defendant to come forward and present evidence to the contrary; is that right?

"A. Yes, sir."

The court again overruled the challenge for cause. Defense counsel resumed his questioning:

"Q. Mrs. Sutton, after the State of Texas rests—and I might explain that process to you. The State always goes first in the presentation of evidence. And once they feel like that they have

presented to you all of the evidence that is necessary for them to present, they will stand up and say, Your Honor, the State rests, which means we are through at the moment.

At that time if the State were to stand up and say, Your Honor, we rest our case, at that time would you require the defendant to come forward and present evidence of his innocence.

"A. No, sir. From what I have gathered here today, they do not have to.

"THE COURT:

Okay. Mrs. Sutton, I again inform you and instruct you that if you are selected on this panel, the court will give you a written charge in which it will tell you that the burden of proof is always on the State and ... remains with the State throughout the trial process.

In addition to that, I will tell you that you are obligated to follow the instructions that are given to you, not withstanding any personal belief. Can you follow those instructions?

"VENIREWOMAN SUTTON:

Yes, Sir.

\*　　\*　　\*　·　\*　　\*　　\*

"Q. [By Defense Counsel] Mrs. Sutton, I am going to go back one more time, and as I explained to you the procedure a moment ago, once the State rests, that signals the end of their case.

My question to you, ma'am, is if the State rested, would at that time you then expect and require the defendant to come forward and present to you evidence of his innocence?

"A. No, sir."

At the conclusion of the examination of the prospective juror, appellant exercised a peremptory strike against her.

A reading of the entire voir dire shows that initially Sutton misunderstood the law regarding the burden of proof; however, after the law was explained to her, she clearly indicated that she understood the State always had the burden of proof, the defendant was not required to put on evidence to establish his innocence, and that

she would follow the law regarding the burden of proof. The trial court correctly overruled appellant's challenge for cause. This point of error is therefore overruled.

■■■ In his fifteenth point of error, appellant argues that he was deprived of a jury of his peers when the State was allowed to challenge for cause any prospective juror who was excludable under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), because of his or her views regarding the death penalty. He asserts that this resulted in the seating of a jury predisposed to find guilt. The United States Supreme Court decided this issue against appellant in the case of *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Appellant's fifteenth point of error is overruled.

■■■ In his sixteenth point of error, appellant complains that the trial court erred in denying his motion to quash the venire because, he argues, the system used in picking potential jurors diluted the representation of women and minorities. The crux of appellant's contention is that by relying only upon the voter registration lists a large number of citizens who have not registered to vote are excluded from jury duty with a high proportion of these individuals being women and minorities.

The record shows that on February 1, 1984, appellant filed his original motion to quash the venire. In this motion he alleged under-representation of young adults from the ages of 18 to 25. On May 14, 1984, appellant filed an amended motion to quash the venire; in this motion he expanded his allegations to include blacks and Hispanics. On May 15, 1984, a pretrial hearing was conducted regarding the amended motion. At that time, the trial court asked appellant if he had any supporting evidence to present. Appellant replied that he did not have any evidence at that time but he would have supporting evidence "in a few days." Appellant asked the court to carry the motion along until he could present evidence in support of the motion. The court instead denied appellant's motion but advised appellant that he could reargue it

later. Voir dire began that day and was concluded on June 20, 1984. On June 21, 1984, over strenuous objection by the State, the trial court allowed appellant to present evidence "of the nature of a bill." [6] Prior to the presentation of the evidence, however, the trial court renewed his denial of appellant's motion to quash the array. The State asserts that because appellant failed to present evidence on his amended motion to quash at the time it was initially presented to the trial court he waived his opportunity to challenge the array; we agree.

In *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980), cert. denied, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980), the defendant orally raised his first challenge to the array *during* the trial court's initial questioning of the jury panel. The trial court noted that he would consider the challenge to the array as being filed. When defense counsel asked for the opportunity to present evidence in support of his challenge prior to the voir dire examination by the parties, the court announced that he would not consider any evidence. The court then overruled Esquivel's challenge to the array because it had not been timely presented. This Court citing the language of Article 35.06, V.A.C.C.P., agreed with the trial court. 595 S.W.2d at 523. We find the instant case analogous to *Esquivel*. Article 35.06 provides that "[t]he court shall hear and determine a challenge to the array *before* interrogating those summoned as to their qualifications" (emphasis added). Thus, the Code of Criminal Procedure clearly provides that the determination of the challenge to the array must be made before the voir dire examination begins. In the instant case appellant timely filed his challenge to the array and the court overruled it before voir dire examination began; however, appellant did not present evidence in support of his motion until *af-*

*ter* the jury had been selected and sworn.[7] Because this evidence was not presented in a timely fashion—indeed, was presented after the jury was seated following a month long voir dire—we will not consider it. Accordingly, this point of error is overruled.

■■■ In his seventeenth point of error appellant alleges the trial court erred in admitting his confession into evidence because, he argues, testimony at the pretrial hearing established that interrogation continued after appellant had invoked his right to remain silent. The record establishes otherwise.

During the hearing on appellant's motion to suppress his confession, Detective J.D. Huffman of the Haltom City Police Department testified that at approximately 6:30 p.m. he went to the boarding house where appellant was staying to inquire about him. While he was talking to the landlord, appellant walked out from a bedroom in the back of the house and began going up the hall toward the living room where Huffman was standing. Huffman testified that he approached appellant and asked him his name and inquired if he had ever been in trouble with the law. Appellant identified himself and told Huffman that he was currently on parole. Huffman related that at that point he believed that appellant might be connected with the offense. Although he did not arrest appellant, Huffman advised him of his constitutional rights: specifically he asked appellant if he would like to have a lawyer and if he would like to remain silent. Appellant replied negatively to both inquiries. Huffman then asked appellant if he knew anything about the victim's car, stereo and television. Appellant replied he did not and said that he had been at the house all day. Huffman testified that he noticed appellant had become "real nervous and hesitant." When appel-

---

6. When the State protested that it was unable to adequately present a defense in such short notice, the trial court, explained:

"What I'm simply trying to do ... is basically let him make his record for the purpose of a bill. I don't want to put the State at some disadvantage unduly with this.

"If a recess would help us and give them a minute to review some of this now that you

kind of see the format that he is using, then you may get with him informally let him show you what he's doing, it might enable us to move a faster."

7. The trial court, as in *Esquivel*, did not rule on the merits of appellant's motion. 595 S.W.2d at 523.

lant turned around and began walking back down the hall to his bedroom, Huffman stopped him and advised him that he was under arrest for the investigation of capital murder. Appellant was then taken to the city jail where he was warned by a magistrate. This warning occurred at 6:55 p.m. Appellant was then placed in a jail cell where he remained until approximately 12:30 a.m. Meanwhile the detectives were engaged in the activities of obtaining and executing a search warrant of appellant's room and obtaining the autopsy results of the victim. Detective Huffman testified that when he returned from the autopsy, at 12:15 a.m., he intended to finish some paperwork and then go home but first he instructed Detective W.B. Allsbrook to fingerprint and photograph appellant so that they would not have to do it the following morning. Allsbrook testified that as he took appellant out of his cell appellant asked him what was going to happen. Allsbrook replied that it was up to appellant. Appellant then began talking about the offense. Allsbrook testified that he stopped appellant immediately in mid-conversation and, after reading him the warnings, Allsbrook asked appellant if he wanted an attorney present and if he wanted to waive his right to remain silent. Appellant replied he did not want an attorney and that he just wanted to talk about the offense. At this point Allsbrook summoned Detective Huffman. Appellant was taken into an office and again given his warnings. Huffman again asked appellant if he wished to have an attorney present and if he wished to waive his right to remain silent. Appellant replied that he wanted to talk to Huffman and he did not need a lawyer. Appellant then began giving an oral statement regarding the offense. Following the giving of the oral statement, it was reduced to writing and signed by appellant.

Appellant asserts that he indicated his wish to terminate questioning and to invoke his right to remain silent at the boarding house when he turned away from Detective Huffman and attempted to go back into his room. Detective Huffman testified he too interpreted appellant's actions as indicating appellant's desire to terminate the interview.

We will approach appellant's contention from two different aspects. First, it is clear from the record that appellant was not in custody and thus not under custodial interrogation when he "invoked" his right to remain silent. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), defines custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612.

Detective Huffman repeatedly testified that appellant was not under arrest and he did not feel it was necessary to arrest appellant until after appellant turned and started to walk back into his room. We find that the claimed invocation of the right to remain silent was not made during any custodial interrogation. See *Cannon v. State,* 691 S.W.2d 664, 671 (Tex.Cr.App. 1985), cert. denied, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986) (defendant's claimed invocation of the right to counsel not made during any custodial interrogation).

■ Second, even if we determine that appellant was in custody at the time he invoked his right to remain silent, the record shows that he later knowingly and voluntarily waived that right when he initiated the conversation regarding the offense with Detective Allsbrook. Immediately after appellant indicated to Detective Huffman that he wanted the interview at the boarding house to terminate, he was placed under arrest and given his warnings again. Appellant was then transported to the city jail where he was immediately taken before a magistrate who also informed him of his rights. These warnings were reduced to writing and signed by appellant. Appellant was then taken to the booking room, allowed access to a telephone and then placed in jail. Some six hours passed before Detective Allsbrook woke appellant up in order to fingerprint and photograph him. No interrogation occurred during this time. Allsbrook testified as he was taking

appellant out of his cell appellant asked him what was going to happen. When Allsbrook replied that it was up to appellant, appellant immediately began talking about the crime. Allsbrook stopped him in midstream and gave him his warnings again, specifically asking appellant if he wanted to waive his right to remain silent. Appellant said he wanted to talk about the offense. Before Detective Huffman began interviewing appellant, he again went over appellant's rights. Once again appellant was specifically asked if he would like to have an attorney present. Appellant replied that he did not need an attorney. Huffman also asked appellant if he would like to remain silent or if he would waive his right to remain silent. Appellant stated that he would like to talk to Huffman. When Huffman asked appellant what he wanted to talk about, appellant replied that he wanted to talk about the offense. Appellant then gave his confession.

The record shows that appellant's request to terminate the questioning was "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Appellant clearly initiated the conversation with Allsbrook. Cf., *Hearne v. State*, 534 S.W.2d 703 (Tex.Cr.App.1976). Thus no violation of appellant's rights occurred when he gave his confession. *Phillips v. State*, 701 S.W.2d 875, 891 (Tex.Cr.App.1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1986). The trial court properly admitted appellant's confession into evidence. Appellant's seventeenth point of error is overruled.

■ In three points of error, appellant contends that his motions to quash the indictment should have been granted and the State should have been compelled to set out the elements of aggravated rape, robbery and burglary of a building.[8] We have consistently held that the allegation of the constituent elements of the offense constituting the aggravating feature of a capital murder charge is unnecessary, even in the face of a motion to quash. *Andrade v. State*, 700 S.W.2d 585, 589 (Tex.Cr.App. 1985), cert. denied, 475 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986); *Hammett v. State*, 578 S.W.2d 699, 708 (Tex.Cr.App. 1979), cert. denied, 448 U.S. 725, 100 S.Ct. 2905, 65 L.Ed.2d 1086 (1980); *Smith v. State*, 540 S.W.2d 693, 697 (Tex.Cr.App. 1976), cert. denied, 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977). Appellant's nineteenth, twentieth and twenty-first points of error are overruled.

In a related point of error, appellant argues that the trial court erred by not quashing the indictment because it failed to specify the exact mode of theft and the exact mode of robbery the State was seeking to prove. We find this contention to be without merit. As we noted above, in a capital murder case the indictment need not allege the elements of the offense constituting the aggravating offense. *Andrade*, 700 S.W.2d at 589 and the cases cited therein. Appellant's twenty-second point of error is overruled.

■ Next appellant argues that V.T.C.A., Penal Code, Section 19.03(a)(2) is unconstitutional because, although the statute assigns capital sanctions to the intentional commission of murder "in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape, or arson," the statute actually prescribes the death penalty for a larger number of crimes including two versions of kidnapping—regular and aggravated, two versions of robbery—regular and aggravated, and no less than four versions of burglary—burglary of a habitation, burglary of a building, burglary of a vehicle and burglary of a coin-operated machine. Appellant asserts that this ambiguity in the

---

8. Appellant was charged with capital murder in a three count indictment. The first count of the indictment contained three paragraphs, with each paragraph alleging a different manner of capital murder. The first paragraph alleged that the murder was committed in the course of the commission of or an attempt to commit an aggravated rape. The second paragraph alleged that the murder was committed in the course of the commission of or an attempt to commit a robbery. The third paragraph alleged that the murder was committed in the course of the commission of or an attempt to commit a burglary of a building.

statute causes the statute to be so vague as to be unconstitutional.

This contention has been previously decided against appellant. In *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App.1975), affirmed *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), this Court examined the constitutionality of Article 1257, V.A.P.C.[9] In answering the question of whether the statute guarded against the arbitrary and standardless imposition of the death penalty, the Court found that the statute

> "limits the circumstances under which the State may seek the death penalty to a small group of narrowly defined and particularly brutal offenses. This insures that the death penalty will only be imposed for the most serious crimes It also insures that the death penalty will only be imposed for the same type of offenses which occur under the same types of circumstances." *Jurek v. State*, 522 S.W.2d at 939.

The Court further found that coupled with the stringent safeguards of Article 37.071, V.A.C.C.P., the Texas death penalty scheme provided against the arbitrary imposition of the death penalty; consequently, we find appellant's contention to be without merit. Appellant's twenty-third point of error is overruled.

■ Prior to the trial court's submission of the charge on punishment to the jury, appellant requested four special charges. The requested charges asked the court to specifically instruct the jury that in answering the special issues they should consider the appellant's age, the appellant's maturity level, the appellant's personal so-

cial history and background and any relevant extenuating circumstances. The court refused to submit these charges. Now appellant argues that the denial of these specially requested charges foreclosed the jury from considering the individuality of the appellant and thereby violated the Eighth and Fourteenth Amendments to the United States Constitution.

Since appellant has filed his brief in this Court, the Supreme Court has issued it opinion in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). There the Court determined that the Texas death penalty statute was unconstitutional as applied because the statutory jury instructions, Article 37.071 V.A.C.C.P.,[10] provided no vehicle for the jury to express its "reasoned moral response" and thus give mitigating effect to Penry's evidence of mental retardation and childhood abuse. No such conclusion in warranted in the case before us today.

Clearly to meet constitutional muster, the sentencing authority in a capital case must be allowed to consider all relevant mitigating evidence. *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The United States Supreme Court, in examining Article 37.071 in regards to a juror's consideration of mitigating evidence, explicitly held that "the Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circum-

---

9. Article 1257 was the immediate predecessor to Section 19.03 and was worded substantially the same. The pertinent part of Article 1257 read as follows:
> "(b) The punishment for murder with malice aforethought shall be death or imprisonment for life if ... (2) the person intentionally committed the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, forcible rape, or arson."

10. Under our capital sentencing procedure a jury, after finding the evidence sufficient to establish guilt, is required to answer three special issues:

> "(1) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
> "(2) whether there is a reasonable probability that the defendant would commit criminal acts of violence that would constitute a threat to society; and
> "(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Article 37.071, V.A.C.C.P.

stances of the individual offense and the individual offender before it can impose a death sentence," *Jurek v. Texas*, 428 U.S. 262, 274, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and prior to *Penry*, this Court had held that the questions prescribed under Article 37.071 allowed the jury to grasp the logical relevance of mitigating evidence, and as such there was no need to further charge the jury regarding evidence of mitigating circumstances. *Stewart v. State*, 686 S.W.2d 118, 121 (Tex.Cr.App.1984), cert. denied 474 U.S. 866, 106 S.Ct. 190, 88 L.Ed.2d 159 (1985); *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.), cert. denied 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1980). After *Penry*, however, in those particular cases where evidence is presented that 1) is mitigati in nature, 2) is relevant to a juror's determination that death would or would not be the appropriate "reasoned moral response" to the defendant's particular circumstances, *and* 3) the mitigating effect of the evidence cannot be considered under the statutory special issues, the trial court judge is required to submit to the jury "instructions informing the jury that it could consider and give effect to the [particular] mitigating evidence ... by declining to impose the death penalty." *Penry*, 492 U.S. at 328, 109 S.Ct. at 2952.[11]

Appellant has failed to direct our attention to where in the record there exists mitigating evidence that would give rise to *"Penry"* special instructions. Nevertheless, from our reading of the record we find that the only evidence offered at trial, even arguably mitigating in nature, was either presented to the jury in the context of the second special issue or was not shown to be significantly relevant to a juror's "reasoned moral response." Consequently, we conclude that the trial court

was not required to submit appellant's instructions to the jury.

First, there is evidence that appellant came from a "disruptive family" and had a "tragic" family life.[12] There is also evidence that appellant was an "average" student and a "good worker." However, no further explanation is given and no attempt is made to relate this evidence to whether death in this case would or would not be a "reasoned moral response" to appellant's circumstance. The phrase "reasoned moral response" was given special significance in the *Penry* decision. The Court specifically held that in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background "we conclude that the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its decision." 492 U.S. at 328, 109 S.Ct. at 2952. The phrase can be traced to *Brown v. California*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), where Justice O'Connor wrote:

"In my view, evidence about the defendant's background and character is relevant because of the belief held by this society that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. This emphasis on culpability in sentencing decisions has long been reflected in Anglo–American jurisprudence. As this Court observed in *Eddings*, the common law has struggled with the problem of developing a capital punishment system that is 'sensible to the uniqueness of the individual.' 455 U.S. at 110 [102 S.Ct. at 874]. *Lockett*

---

**11.** The Supreme Court failed to understand that under Texas law the jury does not "impose the death penalty." The jury in a capital case decides three special issues and, upon an affirmative finding to each, "the court shall sentence the defendant to death." Article 37.071(e) V.A.C.C.P. As such, the high Court failed to inform this Court how the jury is to give "mitigating effect" to mitigating evidence that is not capable of being considered outside the special issues.

**12.** This evidence was presented through the State's witnesses who were called to testify as to appellant's bad reputation in the community from which he came. Appellant did not attempt to offer evidence independent of this. The jurors were not informed of what was meant by a "disruptive family" or "tragic family life" and how such affected appellant and/or the circumstances of the offense.

and *Eddings* reflect the belief that punishment should be directly related to the personal culpability of the criminal defendant. *Thus, the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's character, background, and crime rather than mere sympathy or emotion.*" 479 U.S. at 545 [107 S.Ct. at 841] (O'Connor, J., concurring) (emphasis added).

Subsequent to *Brown*, Justice O'Connor repeated the phrase in her concurrence in *Franklin*, 487 U.S. at 184, 108 S.Ct. at 2333, which was elevated to a holding in the *Penry* decision. From what we can discern, allowing the jury to express its "reasoned moral response" means something more than affording the jury the opportunity to express its "sympathy or emotion" towards the defendant and as such the evidence presented must be the same or of similar character and quality as that found in *Penry*.

Certainly the evidence before us today is not of the same quality and character that the Supreme Court faced in *Penry*. There the Court confronted evidence demonstrating that Penry suffered from organic brain damage and moderate mental retardation. He was shown to have had a gruesome upbringing where as a youth he was beaten frequently resulting in a variety of learning and behavioral dysfunctions in his adult life. The Supreme Court determined that such mitigating evidence "ha[d] relevance to his moral culpability beyond the scope of the special issues and that the jury was unable to express its 'reasoned moral response' to that evidence in determining whether death was the appropriate punishment." 492 U.S. at 322, 109 S.Ct. at 2948. The evidence in this case, however, does not fit into the Supreme Court's rubric of allowing the jury to express its reasoned moral judgment. The evidence is unrelated to any aspect of how or why death in this case would or would not be an appropriate response to appellant's actions and the nonspecific facts of appellant's life are no where comparable to that found in *Penry*.

It should be remembered that *Penry* implicitly reaffirmed the facial constitutionali-

ty of the Texas death penalty laws. 492 U.S. at 318, 109 S.Ct. at 2946–2947 (Supreme Court noting that "the facial validity of the Texas death penalty statute had been upheld in *Jurek* on the basis of assurances that the special issues would be interpreted broadly enough ... [and that] Penry argues that those assurances were not fulfilled *in his particular case* ..." [emphasis in the original]). See also *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 1081, 108 L.Ed.2d 255 (1990) (Supreme Court noting constitutionality of Texas death penalty after *Penry* decision). If we were to hold that the slightest bit of good character testimony, not shown to be relevant to the offense or the offender and yet available to all, warranted a special instruction in every case, we would have serious doubts as to the statute's constitutionality. See *Furman v. Georgia*, 408 U.S. 238, 309–310, 92 S.Ct. 2726, 2762, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring). Thus, the nonspecific nature of the testimony before us today along with the testimony's dissimilarity to that found in the *Penry* case lead us to conclude that the trial court did not err in refusing to instruct the jury with appellant's specially requested charges.

 There is also mitigating evidence of appellant's youth; appellant was twenty-one years old at the time of the offense. The mitigating affect of this testimony, however, was presented to the jury in the context of his ability to reform. Charles Walker, general counsel for the Texas Board of Pardons and Parole, testified and defense counsel argued before the jury that the older a person becomes the more likely he is to turn away from crime. Thus, the jury was allowed under special issue number two to give mitigating affect to appellant's youth and find that because of such he would not pose a future threat to society. See *Russell v. Lynaugh*, 892 F.2d 1205, 1214–1215 (5th Cir.1989); *Mccoy v. Lynaugh*, 874 F.2d 954, 966 (5th Cir. 1989). See also *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality opinion). Accordingly, appellant's last point of error is overruled.

Having found no reversible error, we affirm the judgment.

CLINTON and MALONEY, JJ., dissent for reasons given in *James v. State*, 805 S.W.2d 415, 417, n. 3, (Tex.Crim.App.1990) and in *Ex parte Goodman*, 816 S.W.2d 383 (Tex.Cr.App.1991). They further dissent for the reasons given in *Boyd v. State*, 811 S.W.2d 105 (Tex.Cr.App.1991); *Boggess v. State* (Tex.Cr.App., No. 69,990, delivered May 29, 1991), and *Lackey v. State*, 816 S.W.2d 392 (Tex.Cr.App.1991).

BAIRD, J., not participating.