COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



LAURI ANN LABREE, §

              Appellant, §

v. §

THE STATE OF TEXAS, §

              Appellee. §

§

No. 08-16-00325-CR

Appeal from the

34th District Court

of El Paso County, Texas

(TC# 20120D03598)

## O P I N I O N

A jury convicted Lauri Ann LaBree of misapplication of fiduciary property over $200,000 and assessed a punishment of twenty-five years of confinement, which the trial court imposed as her sentence. In three issues, LaBree challenges her conviction (1) on the sufficiency of the evidence; (2) on the trial court's admission of her statement that she purchased cocaine with misapplied funds; and (3) on the trial court's limitation of the defense's voir dire examination. For the reasons that follow, we affirm.

## BACKGROUND

*The Investigation*

Ralph Kendrick, Jr., is an electrical contractor and sole owner of Kendrick Electric

Corporation, a company he founded in 1970. In 1996, LaBree began working at Kendrick Electric as an assistant to Colleen Miller, who was Kendrick's sister and the person he relied on for "taking care of the books." In March 2006, Kendrick promoted LaBree after Miller was forced to leave the company for health reasons. Kendrick assigned LaBree responsibility of the payroll and the payment of expenses for the company. LaBree had unrestricted access to the company's checks and, among her responsibilities, she made entries in the company's check-register system.

In 2009, Kendrick became concerned about the cash flow of his company. He felt the company was spending too much money on materials yet not making progress on the jobs they were working. He noticed the amount of money spent on materials fell out of line as a percentage of costs spent for labor and big equipment. Kendrick then hired an accounting firm to perform an audit. After one month, the auditors reported they found no problems in the books. Nevertheless, Kendrick remained puzzled.

In July 2010, after Kendrick discovered that LaBree had made two unauthorized charges on the company credit card for payment of two years of property taxes owed on her home, he fired her. Soon thereafter, he discovered one check had been written on his company checking account made payable to a person he did not know and for unknown reasons. The check was made payable to a person named Ronnie Berge. When he went to his bank, he learned of other checks written to the same person, albeit with a slightly different spelling, that were not yet processed. He told his bank he did not write the checks and to stop payment immediately.

After Kendrick contacted the El Paso Police Department, a subsequent investigation uncovered a total of 253 unauthorized checks from Kendrick Electric's bank account all made payable to either a "Ronnie Berge" or "Ronney Berge," dated from 2006 to 2010, which totaled

approximately $1.8 million. After identifying Ronald Berge, police subpoenaed bank statements from his four personal bank accounts. Subpoened records showed that from 2007 through September 2010, approximately $1.67 million in Kendrick Electric checks had been deposited into Berge's accounts, and monies were later withdrawn over time, with approximately $90,000 remaining on deposit. Eventually, Ronald Berge told Detective Stan Hayes of the El Paso Police Department that LaBree had given him the checks which she had taken from Kendrick Electric. Subsequently, LaBree was arrested after she was indicted for one count of misapplication of fiduciary property and one count of theft.[1]

*The Interview*

The day after being arrested, LaBree asked to speak to Detective Hayes to explain her actions. In a recorded interview,[2] LaBree described her work for Kendrick Electric claiming she was employed for sixteen years from 1994 through July 2010. LaBree remarked that her daughter Kali LaBree, and her husband Chip LaBree, were also employed by the company. LaBree said she was responsible for payroll, benefits, and cash receipts, but she claimed she did not have signatory control on the company bank account. As for her employment being terminated in July 2010, LaBree claimed her use of the company credit card to pay property taxes for her home was not improper. LaBree claimed that, during her divorce, she had transferred her half-share ownership of her home to Kendrick.

LaBree claimed she wanted to speak to investigators to disclose that Kendrick himself had been involved in authorizing the checks that were under police investigation. LaBree

---

[1] The jury acquitted LaBree on the theft count of the indictment.

[2] Warnings were administered prior to the interview. LaBree stated she was willing to waive her rights and signed a warning card.

3

claimed that Kendrick used the money from the checks to pay bribes to obtain jobs for his company. As an example, LaBree claimed Kendrick paid bribes to provide lighting work and electrical maintenance for the local school district. LaBree claimed Kendrick used Ronnie Berge to cash the checks, who received a "cut" for himself, then Berge would bring the cash to her and she and her daughter received a "little cut," then she turned over the remainder of cash to Kendrick. She said she would disguise the payment to Ronnie Berge on the company check register by creating an entry described as a company expense for materials or services for the company.

LaBree claimed she had not saved any cash; instead, she claimed that she and her daughter generally purchased cocaine from Berge with their share of company funds. As for Kendrick himself, she claimed he would deposit cash in his personal bank account without returning any money to Kendrick Electric's account. LaBree also contended that Kendrick was involved in a bribery scheme with a local attorney and officials in the Mexican government, and that he used some funds he received for a wind turbine project in Mexico. Finally, she also told Detective Hayes that Kendrick's personal accountant, Cindy Lyons, told her that she did not want to work at Kendrick Electric because of the illicit activity occurring there, and that she herself once called Lyons to ask her how to enter a bribe into the check register.

*The Trial*

The State charged LaBree with one count of misapplication of fiduciary property over $200,000, and one count of theft of property over $200,000.[3] During pretrial conferences

---

[3] Under the pre-2017 version of the statute governing LaBree's conviction, the misapplication of more than $200,000 constituted a first-degree felony. *See* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, 1993 TEX. GEN. LAWS 3653 (amended 2017) (current version at TEX. PENAL CODE ANN. § 32.45(c)(7) (West Supp. 2018)). Under the current version of Section 32.45(c), a person commits the first-degree felony offense of misapplication of

4

regarding LaBree's motion in limine, LaBree objected to admission of statements in which she referred to or described her use of cocaine. LaBree's statements at issue were made on three occasions: in her video interview with Detective Hayes, in her prior testimony at Berge's trial, and in her prior deposition testimony. LaBree argued the statements were extraneous and not relevant; or, alternatively, they should be excluded as being overly prejudicial. Responding, the State argued that the statements were admissions by a party and were not extraneous to the charged offense. The State described that LaBree had volunteered information that she would use the money that she got from cashing checks to buy cocaine. The State argued the evidence provided context for the scheme and regarding the relationship between LaBree, her daughter Kali, and Ronald Berge. Moreover, the State argued the evidence was probative of the issue of motive and it rebutted the defense's claim that Kendrick was involved in receiving money back from the cashing of company checks. The trial court eventually admitted the evidence during the State's case-in-chief, reasoning that its probative value outweighed the risk for unfair prejudice and that it was not being used for an inadmissible character conformity purpose.

At trial, during LaBree's voir dire examination, defense counsel said he wanted to talk to the panel about how a jury decides a case when confronted with conflicting testimony. To illustrate the concept, he posed a hypothetical scenario to a venireperson in which he described a credibility contest between two witnesses. Defense counsel weaved the concept of reasonable doubt into his scenario. The State objected claiming defense counsel had misstated instructions on reasonable doubt and that he was asking venirepersons to commit to facts. Without expressly stating a ruling, the trial court made a comment that a juror could have a reasonable doubt about

---

fiduciary property when the value of the property is $300,000 or greater. TEX. PENAL CODE ANN. § 32.45(c)(7). For the purposes of this appeal, we consider the pre-amendment version of Section 32.45(c).

who was telling the truth and urged counsel to continue.

Defense counsel then returned to his use of a hypothetical scenario that included possible charges of theft and insurance fraud. He then asked whether any of the venirepersons would find a person who admitted to having committed insurance fraud would also find the person guilty of theft under the hypothetical scenario that was described. Several venirepersons responded they would find the person guilty of theft. The State then objected claiming the hypothetical dealt with a factual issue in the case. A brief discussion followed with the court at the bench. Eventually, the trial court stated it needed defense counsel to clarify his argument. Defense counsel responded that he would "just move on and not ask that last question." Defense counsel then discussed other issues without rephrasing his question.

During its case-in-chief, through testimony from Kendrick, the State introduced copies of all 253 checks written to Berge, shown front and back, along with corresponding records to include bank deposit/payment slips, statements of account, and the company's check register detail report. Each check was individually shown to and admitted through Kendrick, who testified that (1) each of the checks belonged to Kendrick Electric; (2) he did not authorize any of the checks; (3) his signature was not present on any of the checks; and (4) a purported signature of Berge appeared on the back as an endorsement. While testifying, Kendrick identified the date of each check and the amount for which each check was written. For each check made payable to Berge, Kendrick testified that Berge did not perform work for Kendrick Electric nor was he a customer or vendor of the company. Lastly, Kendrick also testified that the corresponding entry in the company's check register did not match with the check written, and instead, listed other individuals or businesses who were known to Kendrick. While testifying, Kendrick also mentioned that the bank stopped sending him copies of the checks with their statements in 2007

6

or 2008.

During cross-examination, LaBree's attorney questioned Kendrick about several defensive claims made by LaBree. First, her attorney noted several occasions when the amount of the check differed from the amount shown on the corresponding deposit. Kendrick agreed there were differences seen in the amounts when comparing checks and deposits for those records he was shown. Second, her attorney confronted Kendrick with checks written to his sister, Colleen Miller, prior to her departure from the company. Kendrick testified the checks shown were not authorized and they did not contain his signature. Third, when asked, Kendrick denied having a romantic relationship with LaBree, but he admitted he had been bothered that LaBree's boyfriend made frequent appearances at her work. Fourth, Kendrick acknowledged that he invested in coins and in a wind turbine project in Mexico.

In addition to Kendrick, Detective Hayes testified in the State's case-in-chief about his investigation of Kendrick's complaint. Detective Hayes described that he started with an interview of Kendrick and from his interview he then determined the records, if any, he would need for further review. From the initial checks that Kendrick provided, Detective Hayes then identified and subpoened bank account records corresponding to how the checks were deposited. Records he reviewed included the personal bank records of Kendrick and Ronald Berge. These statements showed Berge maintained deposits in his accounts as opposed to merely cashing out checks as LaBree had alleged. Detective Hayes also testified that bank records did not confirm LaBree's claim that Kendrick had withdrawn millions of dollars from the company and had deposited the funds into his personal bank account.

As for other claims, Detective Hayes testified that Kendrick's credit card statements confirmed $1.2 million in coin purchases from 2008 to 2011, however, the amount fell far short

of the $4 million claimed by LaBree. Further, Detective Hayes testified that a review of the property records associated with LaBree's house revealed that LaBree and her husband owned her house when she used the company credit card to pay its property taxes, and that Kendrick did not have an ownership interest in the home. On cross-examination, Detective Hayes admitted he did not request writing exemplars from LaBree to compare to the signatures on the checks.

Finally, the State presented testimony from Cindy Lyons, Kendrick's personal accountant, who testified that LaBree had not asked her how to enter a bribe into the company's books as LaBree had claimed, and that she had not told LaBree that she did not want to work for Kendrick because of any sort of illegal activity that was occurring. Lyons stated that she did not believe Kendrick was engaged in any sort of illegal activity, and she agreed that Kendrick was "honest" and "straightforward."

In its closing statements, the defense argued, *inter alia*, that Kendrick was involved in the check-cashing scheme. The defense argued LaBree did not apply the funds in a manner contrary to Kendrick's instructions and LaBree made no admission of keeping the money. The defense argued that Kendrick was a sophisticated businessman who knew the financial details of his company. The defense also argued that Kendrick himself was not the victim of the alleged offense because Kendrick Electric was listed as the victim on the indictment. The defense also noted that Kendrick's purchase of gold coins was suspicious and suggested that he was engaging in illicit behavior. Finally, the defense argued that Kendrick framed LaBree for the offense because he was seeking revenge for her ending their affair and becoming romantically involved with her new boyfriend.

The jury convicted LaBree of misapplication of fiduciary property totaling over $200,000, acquitted her of theft of property totaling over $200,000, and assessed punishment at

8

twenty-five years' incarceration.  This appeal follows.

## DISCUSSION

LaBree challenges her conviction in three issues ordered as follows.  First, she argues that the trial court erred by admitting evidence that she used cocaine, which she contends was inadmissible extraneous offense evidence and was unfairly prejudicial.  Second, she argues that the evidence was legally insufficient to support the misapplication element of the offense of misapplication of fiduciary property because the evidence established that Kendrick directed LaBree to cash the checks and return funds to him, and thus, LaBree did not act in a manner contrary to an agreement with Kendrick, the owner of the funds.  Finally, LaBree argues that the trial court abused its discretion when it limited defense counsel's voir dire examination by failing to permit defense counsel to explain to the jury that misapplication of fiduciary property cannot be supported if the owner of the property consents to the fiduciary's handling of the property.  Taken out of order, we will first consider LaBree's legal sufficiency challenge.

## 1.  Legal Sufficiency Challenge

In her second issue, LaBree argues that the evidence supporting her conviction for misapplication of fiduciary property over $200,000 was legally insufficient.  In particular, she posits that the State did not prove the "misapplication" element of the offense beyond a reasonable doubt because the evidence established that Kendrick, the owner of the property, was involved in the check-cashing scheme and ordered LaBree to write checks to Berge, and thus the evidence showed that LaBree did not act contrary to an agreement with Kendrick regarding the funds.

*Applicable Law*

In a legal sufficiency challenge, we determine whether, viewing all evidence in the light

9

most favorable to the jury's verdict, any rational jury could have found the essential elements of the charged offense beyond a reasonable doubt. *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Evidence may be legally insufficient when the record "contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt." *Id*. (quoting *Britain v. State,* 412 S.W.3d 518, 520 (Tex. Crim. App. 2013) (citation omitted)). We may not re-weigh evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Further, we presume that the jury resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that determination because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to their testimony. *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010).

As it pertains to this case, a person commits the first-degree felony offense of misapplication of fiduciary property if she intentionally, knowingly, or recklessly misapplies property she holds as a fiduciary in a manner that involves substantial risk of loss to the owner of the property, and the value of the property misapplied is $200,000 or more. TEX. PENAL CODE ANN. § 32.45(b), (c)(7). In the context of this offense, the Penal Code provides several relevant definitions. "Fiduciary" includes "an officer, manager, employee, or agent carrying on fiduciary functions on behalf of a fiduciary." *Id*. § 32.45(a)(1)(D). "Misapply" means to deal with property contrary to an agreement under which the fiduciary holds the property. *Id*. § 32.45(a)(2)(A). "Owner" means a person who has title to the property, possession of the property (whether lawful or not), or a greater right to possession of the property than the actor.

10

*Id.* § 1.07(a)(35) (West Supp. 2018). Further, a "substantial risk of loss" means that a real possibility of loss exists, and that the risk of loss is a positive possibility and more likely than not to occur. *Salcido v. State*, No. 08-04-00286-CR, 2006 WL 1183191, at *5 (Tex. App.—El Paso May 4, 2006, no pet.) (not designated for publication) (citing *Dwyer v. State*, 836 S.W.2d 700, 702 (Tex. App.—El Paso 1992, pet. ref'd)).

*Analysis*

On appeal, LaBree argues that the evidence does not support the misapplication element of the offense. In particular, LaBree contends the evidence proved that Kendrick was involved in the check-cashing scheme, and that since Kendrick was the owner of the misapplied funds who directed LaBree to write and cash the checks and return the funds to himself, LaBree as a fiduciary could not have dealt with the funds in a manner contrary to an agreement under which she held the funds. *See* TEX. PENAL CODE ANN. §§ 32.45(a)(2)(A), 32.45(b).

In support of this contention, she points to several defensive theories suggested by the evidence presented at trial. First, LaBree argues that the fact that Kendrick did not become suspicious of the amount of money the company was spending until 2009 or 2010—approximately three or four years after the first misapplied check was written in June 2006—and the fact that Kendrick only became suspicious after more than 250 checks had been written over the span of years, suggests that he was involved in the check-cashing scheme. Second, LaBree also argues that Kendrick was not credible when he testified that he hired a bookkeeping firm to perform an audit, yet he also asked LaBree to provide assistance. Third, LaBree cites the statement she gave to law enforcement, in which she claimed that Kendrick himself was directing the check-cashing scheme. In support of this contention, LaBree also cites the same interview in which she claimed that Miller, Kendrick's sister, was engaging in the same practice

11

by writing checks in her name, cashing the checks, and returning the funds to Kendrick. Fourth, LaBree also argues that Kendrick was involved in the check-cashing scheme by relying on statements in the interview in which she claimed that Kendrick used approximately one million dollars to bribe an attorney and Mexican officials, as well as Kendrick's testimony that he paid $350,000 to the attorney as a bribe for a turbine project in Mexico. Finally, LaBree contends the evidence showed that Kendrick was not ethical because he engaged in an alleged money laundering scheme involving the purchase of gold coins, and that this evidence suggests he was also involved in the check-cashing scheme.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that legally sufficient evidence exists in the record to enable a rational jury to have found the misapplication element of the offense beyond a reasonable doubt. The State presented evidence which showed the following: according to Kendrick's testimony, LaBree worked as a bookkeeper of Kendrick Electric from 2006 until 2010, and during that time she managed the company's check register and had access to the company's checks and other business records. While working, LaBree executed a total of 253 checks to Berge, over the span of approximately four years, as established by admission of copies of each check along with the corresponding check register, which were all presented by the State at trial. The State also established that LaBree made falsified entries in the check register by recording false payees in it, and the jury could have reasonably inferred that she did so to conceal her actions.

The evidence in the record further suggests that, as shown by Berge's bank statements produced at trial, Berge assisted LaBree in the offense by depositing the misapplied funds into his personal bank accounts. At the conclusion of the scheme, in September 2010, each of Berge's four bank accounts had approximately $18,000 to $27,500 in them, and the bank statements

12

showed that the total amount of withdrawn funds from all accounts was approximately $1.67 million during the relevant period. Given the amount of funds in each of the accounts present at the conclusion of the check-cashing scheme, along with the total amount of withdrawn funds from the accounts from 2007 to September 2010, the jury could have reasonably inferred that, contrary to LaBree's defensive theory, Berge was not returning the majority of the funds to LaBree so that she could in turn return the funds to Kendrick. As such, evidence in the record established that Berge shared some of the proceeds from the check-cashing scheme with LaBree, and she further admitted in her interview that she used the funds to purchase cocaine from Berge for her personal consumption. Likewise, giving deference to the verdict, as we must, we presume that the jury believed Kendrick's testimony that he did not authorize LaBree to write the checks to Berge, that he did not know who Berge was, and that he had never engaged in business with Berge; thus, Kendrick's testimony supports the misapplication element as well. *See Williams*, 235 S.W.3d at 750.

As such, while the jury could have chosen to believe LaBree's theory that Kendrick was involved in the check-cashing scheme, it was also free to conclude that Kendrick, as the owner of the funds, was not involved in the check-cashing scheme and had not directed LaBree to write the checks to Berge, and that LaBree thus acted in a manner contrary to an agreement with Kendrick regarding the misapplied property. *See id*. (we presume that the jury resolved any conflicts in the evidence and in favor of the verdict and give deference to its determination of the facts); *Padilla v. State*, 326 S.W.3d 195, 201 (Tex. Crim. App. 2010) (rational fact finder can consider a defendant's untruthful statements, along with other evidence in the case, as affirmative evidence of guilt); *see also Berge v. State*, No. 08-15-00263-CR, 2017 WL 2351093, at *5 (Tex. App.—El Paso May 31, 2017, no pet.) (not designated for publication) (in defendant

13

Berge's trial for the same events which forms the basis for this case, the jury was free to consider defensive theory as being implausible in light of the number of misapplied checks, the amount of misapplied funds, and the extended period of time over which a check-cashing scheme occurred). The jury was also free to believe Detective Hayes's testimony that LaBree's version of events did not comport with the evidence gleaned from subpoenaed bank statements associated with Kendrick's and Berge's accounts. Finally, the jury was free to reject LaBree's defensive theory by crediting Lyons's testimony that LaBree had never asked her how to enter a bribe into the company's books, or that Lyons did not believe Kendrick was involved in illicit activity.

In sum, viewing the evidence in the light most favorable to the verdict, we conclude that sufficient evidence in the record exists to enable the jury to have rationally found beyond a reasonable doubt that LaBree misapplied over $200,000 in a manner contrary to her responsibilities as a fiduciary of Kendrick Electric. As such, legally sufficient evidence supporting the misapplication element of the offense exists, and LaBree's legal sufficiency challenge must fail. *See Berge*, 2017 WL 2351093, at *5 (sufficient evidence to support conviction for misapplication of fiduciary property existed where defendant assisted in misapplying 253 checks totaling $1.8 million over the span of four years, and where the defensive theories at trial were implausible and not supported by other evidence); *Showery v. State*, 678 S.W.2d 103, 106 (Tex. App.—El Paso 1984, pet. ref'd) (testimony of complainant supported by documentary evidence was sufficient evidence supporting conviction for misapplication of fiduciary property). LaBree's second issue is overruled.

## 2. Evidence Regarding LaBree's Cocaine Usage

In her first issue, LaBree contends the trial court abused its discretion when it admitted

14

extraneous offense evidence of her prior cocaine use.

## Rule 404

LaBree contends that evidence of cocaine use was inadmissible "extraneous offense evidence" under Rule 404(b). We disagree.

We are persuaded that the trial court properly admitted her comments regarding use of cocaine because the evidence was relevant to prove her motive, intent, and plan to commit the offense of misapplication of fiduciary property. Contrary to LaBree's contention, evidence of extraneous narcotics offenses need not be similar to the charged offense to be admissible. *See* TEX. R. EVID. 404(b)(1); *see also Knight v. State*, 457 S.W.3d 192, 203 (Tex. App.—El Paso 2015, pet. ref'd) (evidence regarding defendant's possession of narcotics was properly admitted to show her intent, knowledge, and lack of mistake in committing the charged offense); *Worsham v. State*, No. 2-02-464-CR, 2004 WL 1067772, at *4 (Tex. App.—Fort Worth May 13, 2004, pet. ref'd) (mem. op., not designated for publication) (probative value of extraneous offense evidence regarding narcotics activity was properly admitted under Rule 404(b) to show defendant's motive for committing non-narcotics-related offense of murder). Here, the record supports the trial court's ruling. LaBree's admission that she bought cocaine with her share of the cash she received from Berge established her motive, plan, knowledge, and absence of mistake in participating in the scheme with Berge. *See Knight*, 457 S.W.3d at 203. There is an affirmative link between her admission to the use of cocaine and the offense itself as she described purchasing the drugs with her share of proceeds. *See Knox v. State*, 934 S.W.2d 678, 683 (Tex. Crim. App. 1996). Thus, we find the trial court did not abuse its discretion.

## Rule 403

LaBree also argues that the probative weight of the evidence was substantially

outweighed by the risk of unfair prejudice in violation of Texas Rule of Evidence 403, citing the relevant factors promulgated by *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). *See* TEX. R. EVID. 403. A court may exclude relevant evidence if the probative value of the evidence is substantially outweighed by the risk of unfair prejudice. *Id*. Rule 403 favors the admission of relevant evidence, including extraneous offense evidence, and presumes that relevant evidence is more probative than unfairly prejudicial. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). In determining whether a trial court violated Rule 403 by the admission of evidence, we balance the following factors: (1) the inherent probative value of the evidence and (2) the State's need for the evidence, against any tendency of the evidence to (3) suggest a decision on an improper basis, (4) confuse or distract the jury from the main issues, (5) be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or be needlessly cumulative. *Gigliobianco*, 210 S.W.3d at 641–42.

We review the trial court's decision to admit evidence under the abuse of discretion standard. *Knight*, 457 S.W.3d at 201–02; *Montgomery v. State*, 810 S.W.2d 372, 378–79, 391 (Tex. Crim. App. 1990) (en banc.) (op. on reh'g). We will uphold the trial court's decision to admit or exclude evidence if it falls in the zone of reasonable disagreement, and we afford "great discretion" to a trial court in its decision to admit evidence and give corresponding deference to its evidentiary decisions. *See Knight*, 457 S.W.3d at 201–02; *Montgomery*, 810 S.W.2d at 378–79, 391.

Based on our application of the *Gigliobianco* factors associated with Rule 403, we find that the trial court did not abuse its discretion in admitting LaBree's prior statements regarding her cocaine usage. LaBree's statements were probative of her motive and intent to commit the

16

offense. Likewise, the State's need for the evidence was high since LaBree's statements that she used the misapplied funds to purchase cocaine from Berge established a motive for committing the charged offense, and the evidence tended to rebut the defense's theory that she engaged in the check-cashing scheme at Kendrick's behest. *See, e.g., Moses v. State,* 105 S.W.3d 622, 626–28 (Tex. Crim. App. 2003) (extraneous offense evidence which rebuts a defensive theory may have high probative value outweighing the risk of unfair prejudice); *Massey v. State*, 826 S.W.2d 655, 656–59 (Tex. App.—Waco 1992, no pet.) (testimony that defendant committed robberies to purchase crack cocaine was probative evidence of motive, which was not outweighed by the risk of unfair prejudice).

On the other hand, it is unlikely that the jury had an irrational emotional response to the evidence of LaBree's cocaine use because the charged offense, first-degree misapplication of fiduciary property, was more serious than the extraneous offense and since the evidence consisted of brief statements made by LaBree during her recorded interviews. Likewise, the statements did not create the impression that LaBree was engaged in narcotics trafficking, but only that she had purchased cocaine for her personal consumption. The evidence also did not comprise a large portion of the State's case or take an inordinate amount of time to develop. As such, the evidence was unlikely to distract the jury from the main issues in the case. *See Rios v. State*, No. 08-12-00089-CR, 2014 WL 2466100, at *7 (Tex. App.—El Paso May 30, 2014, no pet.) (not designated for publication) (admission of defendant's prior conviction for possession of cocaine had only a slight potential for impressing the jury irrationally, and any unfair prejudice was outweighed by the evidence's probative value); *Worsham*, 2004 WL 1067772, at *4 (probative value of extraneous offense evidence regarding drug activity was not outweighed by the risk of unfair prejudice where evidence tended to establish defendant's motive for

17

committing murder, and the drug activity evidence constituted a small portion of the State's case).

We conclude that the trial court did not abuse its discretion in admitting evidence of LaBree's cocaine usage, such that its decision was outside the zone of reasonable disagreement. *See Moses,* 105 S.W.3d at 626–28; *Massey*, 826 S.W.2d at 656–59; *Rios*, 2014 WL 2466100, at *7; *Worsham*, 2004 WL 1067772, at *4. LaBree's first issue is overruled.

### 3. Restriction of Defense Counsel's Voir Dire Examination

In her third issue, LaBree argues that the trial court abused its discretion by limiting defense counsel's voir dire examination. LaBree contends that the trial court erred when it prevented defense counsel from explaining to the jury that "misapplication of fiduciary [property] cannot be supported if the owner of the business is involved."

*Applicable Law*

A defendant has a Sixth Amendment right to ask prospective jurors questions to intelligibly exercise peremptory challenges and challenges for cause. *Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004). The conduct of voir dire rests largely with the sound discretion of the trial court; as such, a trial court's decision to restrict a party's voir dire examination is reviewed for abuse of discretion. *Cantu v. State*, 842 S.W.2d 667, 687 (Tex. Crim. App. 1992). A trial court abuses its discretion when it prohibits a proper question during voir dire about a proper area of inquiry. *Sells v. State*, 121 S.W.3d 748, 755–56 (Tex. Crim. App. 2003). A question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Id*. at 756. Nevertheless, a trial court may impose reasonable restrictions on a party's voir dire examination, such as the exclusion of questions which are misleading, confusing, vague, or overly broad, or questions which seek an improper commitment from the prospective

18

jurors. *Hernandez v. State,* 390 S.W.3d 310, 315 (Tex. Crim. App. 2012).

However, a party may waive its voir dire complaint on appeal if the trial court does not impose an absolute limitation on the underlying substance of the party's voir dire question, and the party abandons a line of inquiry instead of rephrasing the improper question. *See Wright v. State,* 28 S.W.3d 526, 534 (Tex. Crim. App. 2000), *superseded on other grounds by Coleman v. State*, No. AP-75,478, 2009 WL 4696064 (Tex. Crim. App. Dec. 9, 2009) (not designated for publication); *Trevino v. State*, 815 S.W.2d 592, 601 (Tex. Crim. App. 1991), *overruled on other grounds by Trevino v. Texas*, 503 U.S. 562, 112 S.Ct. 1547, 118 L.Ed.2d 193 (1992); *Bolden v. State*, 73 S.W.3d 428, 430–31 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (citing *Howard v. State*, 941 S.W.2d 102, 108 (Tex. Crim. App. 1996), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535 (Tex. Crim. App. 2014)); *Lewis v. State*, No. 10-05-00267-CR, 2006 WL 2627321, at *4–5 (Tex. App.—Waco Sept. 13, 2006, no pet.) (mem. op.) (not designated for publication).

*Analysis*

During the defense's voir dire examination, defense counsel posed the following hypothetical to the panel: suppose a person owned a car whose note he could no longer pay, and he asked a friend to take the car to Mexico and help him sell it so that he would be relieved of responsibility from paying the note. A surveillance camera caught the friend taking the car, and the friend was arrested. When the police questioned the owner of the car, he claimed that he did not give permission to the friend to take the car. The friend was charged with theft and claimed that the owner gave him permission to take the car, but the owner denied having done so. Defense counsel asked the panel whether they would consider his proposed scenario an example of a theft, and then further commented that if jurors could not decide whether the owner of the

19

car or the friend was telling the truth in the scenario presented, then reasonable doubt would exist, and their verdict would have to be not guilty.

The State objected that defense counsel was asking the jury to commit to a set of facts and attempting to define reasonable doubt during his voir dire. The trial court made a comment that a juror could have a reasonable doubt about who was telling the truth and urged counsel to continue. Defense counsel then changed the hypothetical, asking the jury whether an employee of a company could be convicted if he misapplied funds in agreement with the company's owner. The State objected, reasoning that defense counsel's hypothetical dealt with the factual issues of the case and was not a proper legal argument.

In response, defense counsel provided the trial court with proposed jury instructions on this issue. After the trial court read the instructions, it responded that it was "missing the point" of defense counsel's instructions. Defense counsel stated that his follow-up question would be whether the jury would find the employee guilty if they found that he was misappropriating property, but also found that the owner was involved. Following the State's response, and before the court's ruling, defense counsel stated, "If it's okay with you, I'll leave it where I'm at and I'll just move on and not ask that last question." The trial court responded, "Just leave it. It is getting confusing." Again, the State responded that defense counsel's hypothetical constituted a factual issue and that the facts explained did not trigger a legal mechanism requiring any specific response by the jury. The trial court stated that it understood the State's argument, and defense counsel responded that he would "leave it where it is." Defense counsel then discussed other areas of inquiry without returning to this matter.

The State argues that Labree waived her voir dire complaint on appeal because the trial court did not prohibit defense counsel from asking questions about an entire area of inquiry, and

20

because the record shows that defense counsel voluntarily abandoned his line of questioning without rephrasing his question. We agree. The record shows that defense counsel was not precluded from asking questions regarding an entire area of inquiry, i.e., whether an employee of an institution could be convicted of misapplication of fiduciary property if the owner of the property was involved in the activity. Instead, the trial court only stated that it was confused about the form of defense counsel's posed hypothetical, and defense counsel replied that he would move on and not ask his question. Following the trial court's expression of confusion regarding defense counsel's hypothetical, defense counsel voluntarily abandoned his line of inquiry and moved on to other topics in his voir dire examination.

Since the trial court did not preclude defense counsel from asking questions regarding an entire area of inquiry and only restricted the form of the question, and because defense counsel did not rephrase his question but instead voluntarily abandoned his line of inquiry, LaBree has waived her complaint that the trial court improperly restricted defense counsel's voir dire examination. *See Wright,* 28 S.W.3d at 534; *Howard*, 941 S.W.2d at 108; *Trevino*, 815 S.W.2d at 601; *Bolden*, 73 S.W.3d at 431; *Lewis*, 2006 WL 2627321, at *4–5. LaBree's third issue is overruled.

## CONCLUSION

Having overruled LaBree's first, second, and third issues, the trial court's judgment is affirmed.

GINA M. PALAFOX, Justice

October 12, 2018

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

21